Guerry STRONG, Appellant,

v.

SUNRAY DX OIL COMPANY et al., Appellees.

No. 222.

Court of Civil Appeals of Texas.

Corpus Christi.

Dec. 4, 1969.

Rehearing Denied Dec. 31, 1969.

———◆———

Sterling Holloway, Austin, Mills, Shirley & McMicken, Preston Shirley, Galveston, for appellant.

Crawford C. Martin, Atty. Gen., of the State of Texas, J. Milton Richardson, Asst. Atty. Gen., for the State of Texas, intervenor.

Claude C. Roberts, Houston, for Industrial Gas Co.

M. Darwin Kirk, J. P. Greve, Rufus N. McKnight, Jr., Tulsa, Okl. for Sun Oil Co.

Richard D. Cullen, Victoria, and Vinson Elkins, Weems & Searls, Thomas Fletcher, Dave McNeill, Jr., Houston, for Sun Oil Co., United Gas Pipe Line Co., Union Producing Co., and Monsanto Co.

R. H. Whilden, C. E. Nadeau, Houston, for Shell Oil Co.

David R. Latchford, R. T. Wilkinson, Jr., Houston, for Mobil Oil Corp., Republic Natural Gas Co., Albantu Oil & Gas Corp., East Wall Street Corp., Long Point Corp., Mon-Dak Oil Corp., The Chase Manhattan Bank and William B. Bateman, Trustee.

Dillard W. Baker, Walter B. Morgan, Houston, for Humble Oil & Refining Co.

Guittard, Henderson, Jones & Lewis, Frank Guittard, Victoria, for C. K. McCan, Emily Herder, Margaret V. Lowery, Eileen Sullivan, W. H. Crain, Jr., and others (Landowners known as J. A. McFaddin Estate).

## OPINION ON MOTION FOR RE-HEARING

NYE, Justice.

The original dissenting opinion is withdrawn and this opinion sustaining appellees' motion for rehearing and affirming the judgment of the trial court is substituted therefor as the majority opinion of this Court.

This is an appeal by the plaintiff from the trial court's directed verdict of no vacancy existing on defendant's lands. A paramount issue involves the correctness of the directed verdict and therefore requires consideration from the viewpoint most favorable to appellant on all the evidence of probative value. The conclusions reached in this opinion are drawn from a careful consideration of all evidence, admitted or excluded, which was reviewed and discussed in the various briefs of all the parties.

The appellant's petition describes two areas by metes and bounds as being the alleged vacant land. The upper or northern area of 4353.5 acres called the "A" Vacancy is located by appellant as being between the Traviesa Grant and the Vairin Grant. (See Plat 1). The lower or southern area of 2618.34 acres called the "B" Vacancy is located primarily within the original Traviesa Grant. (See Plat 1.) The area of 460.45 acres designated as the "C" Vacancy is entirely embraced within the "A" Vacancy but consists of an overlap of the "A"

and "B" vacancies. (See Plat 1). The appellant also contends for an alternate "A" Vacancy of 1855.3 acres which is included within the area designated as "A" Vacancy.

The vacant land is claimed to exist between the boundaries of a series of grants which began at the confluence of the Guadalupe River and the San Antonio River (sometimes referred to in the old ancient documents as the "Bexar River" or "La Bahia River"), and extending northwesterly along the Guadalupe River and Coleto Creek about eighteen miles toward Goliad. It is extremely important at the outset to review historically the manner in which these grants of land originated and attempt to retrace the steps of the original surveyors and determine, if possible, the intent of the grantor. The rules for the construction of grants, is determined in this fashion. Once the intention of the grantor is definitely ascertained, all else must yield. Phillips Petroleum Co. v. State, 63 S.W.2d 737 (Tex.Civ.App., Austin, 1933, wr. ref.).

The basic documents concern primarily the old Mexican grants within the colony extended by the Commissioner Vidaurri. The contract provisions of this colony are so well known that they are a matter of judicial knowledge. Sayles Early Laws, Vol. 1, Art. 108; Harris v. O'Connor, 185 S.W. 2d 993 (Tex.Civ.App., El Paso 1944, w. o. m.).; Hatch v. Dunn, 11 Tex. 708.

One hundred forty five years ago Priest Jose Antonio Valdez (formerly an Army Chaplain) applied for lands to be bounded by Geronimo Huizar, a proposed neighbor. On June 10, 1824 the Chief of the Provincial Deputation went on the ground accompanied by Huizar and the Priest and made a survey for the Priest. It began 200 pasos salamones (double steps) above Apache Crossing with course east to Mesquite de Ventura. The ancient recitation said:

"* * * It contained 10,667 varas, and all the land comprised from this measurement south to the junction of the said Guadalupe and Bexar Rivers amounts to a little more than four leagues, bounded on the North by vacant lands, the headwaters of Aguilar creek and another creek which is formed between the Prairie called Menchaca's Prairie and the said Mesquite de Ventura, a straight line 200 steps above Apache Crossing; on the east by the Lagoons which the Guadalupe forms; on the south by the junction of this River and the Bexar; and on the west by the said Bexar River to the said point of the Apaches, 200 steps above, as said; * * *"

On June 11, 1824, the Chief of the Provincial Deputation went on the land again accompanied by Huizar and the Priest and made a survey, this time for Huizar. Huizar's grant provided for a boundary "on the south until reaching the Aguilar mott land surveyed for the Priest Don Jose Antonio Valdez." This south boundary for Huizar was along the same line as the north boundary of the Priest Jose Antonio Valdez.

About ten years later, Commissioner Vidaurri started signing and issuing titles to the 18 grants out of which appellant claims his vacancy. The first one of these grants was titled to the Priest's son J. M. Valdes on October 8, 1834. His grant covered a little more than one league of land beginning at the mouth of the San Antonio River where it joins the Guadalupe. The description probably invades the Priest's land a little, but since it was his son and he had four leagues, it made little difference to him, apparently. This J. M. Valdes tract was located between the confluence of the Guadalupe and San Antonio Rivers. The closing lines of this grant called for a north course of 5800 varas to be bounded on the west by the Priest. The next call was northeast 2780 varas to the Guadalupe River. This last direction call set the direction for each of the tier of grants, as each course thereafter was parallel to the northwest boundary of the J. M. Valdes Grant. The grant was for a league and one fourth and admonished the grantee with the recitation of "practicing all acts of true possession". Appellees contend that each and every one of the 18 grants are tied together by adjoinder calls and by the respective directions away from the Guadalupe River and the Coleto Creek as evidenced by the

original adjudication of titles. If this is true, it is decisive of this lawsuit as it determines the intent of the parties to the colonization of these grants and leaves no vacant land in between. We agree.

This can be demonstrated in a number of ways by the undisputed evidence. The entire system of 18 tracts is likened in some respects to the ordinary everyday farm subdivision of 18 lots in one block all fronting on a river. There were basically few natural landmarks. The grants (lots) were described with a number or by the original settlers' name rather than by metes and bounds. The tracts of land followed a similar pattern to that of the porciones along the Rio Grande River which were likewise granted by the Mexican Government. They were designed to front on the river so as to give each owner some valuable water frontage. The frontage was narrow as compared to its length, as it extended back from the river. The early courses were not governed by the exactitudes of degrees and minutes but each course was dependent upon the other with parallel lines. Usually the first lateral line determined the course for all surveys in the system. This is the situation here. (See Plat 2).

———•———

This sketch drawn from the 1841 map (Plaintiff's exhibit 19). The frontage distances (on the west side of the grants) were taken in part from Plaintiff's exhibit 19 and are the same stated in the original grants. The numbering of the grants through Hidalgo #11th were taken from Plaintiff's exhibits 17 and 109 (also very early maps of the area). Numbers 12 through 18 are supplied for identification. Juan Rene and single son (Juan Rene) was one grant (15).

PLAT 2

[A7Q2]

In an attempt to reconstruct the footsteps of the surveyors and to determine the intent of the original parties to the grants, one has but to follow the calls of each grant from the beginning to the end, to fully understand the purpose that Commissioner Vidaurri wished to be accomplished in the colonization of this land. Beginning with the J. M. Valdes (Tract No. 1), its northerly line called for 2780 varas on a course northeastwardly terminating at the Guadalupe River and to be bounded on the north by vacant lands. The distance up the Guadalupe River from the confluence on the Valdez tract was never given. The Maria Josepha Traviesa (Tract No. 2) called for an adjoiner on the southeast by J. M. Valdes (the owner of Tract No. 1) and its called distance on this line to the river was exactly 2780 varas. This will bind the Traviesa to the Valdez. The northerly line of the Traviesa (Tract No. 2) had a called distance to the river of 8790 varas and was to be bounded on the north by lands of "citizen _____", the next grant in the series. It is apparent that the Traviesa Grant was not to be bounded by vacant lands but was to be bounded by some citizen colonist whose name was not remembered or unknown at the moment, or whose name was to be filled in the blank space at a later time. Looking back in the ancient documents we find that Traviesa application was September 20, 1834 and title was granted on October 8 of that same year. The "citizen _____" referred to in the Traviesa Grant, made application for title on October 20, one month later, and was granted title on October 29, twenty one days after Traviesa. When this third grant received title on October 29 it was apparent that the citizen's name was Vairin. The called distance of the Vairin Grant on the southeast to the river was 8790 varas, the absolute number of varas called for to the River Guadalupe by Traviesa on her upper boundary. If this wasn't enough to tie it together, it did so by the adjoiner call to be bounded on the southwest by the Dona Josepha Traviesa tract. In addition, the draftsman called the Vairin "Tract No. 3", and it was the third tract northwestward from the junction of the two rivers.

The Vairin tract on the upper or northwest side had a called distance to the river of 10,780 varas. Fernet No. 4 was called "No. 4" in the grant. It had the exact same called distance of 10,780 varas. In addition, it called to be bounded on the lower or southeast side by Vairin. Continuing, Fernet's upper or northeast called distance to the river was 10,240 varas and Tract No. 5 adjudicated and titled to Ramon had a lower call of exactly 10,240 varas to the river. It called to be bounded on the southwest by Fernet. Each of the called distances from Valdez through Ramon, to and from the river, was different, yet each was exactly the same on their bounded borders, and each called for the other. The variation of distance away from the river in these grants was probably caused by the Guadalupe River (the only natural object) which was crooked, but because these distances were different, they point with certainty the intent of the grantor that each tract was to be bounded and tied together. (See Plat 2).

It is appellant's contention that the calls for course (along the river) and distance (number of varas) down the river should prevail over these exact distance parallel adjoining calls away from the river and the naming of the adjacent grants as adjoining calls. The general rule has always been in this state that calls for adjoiner will ordinarily prevail over calls for distance. (See C. M. Frost et al. v. Socony Mobil Oil Company, Inc., et al., 433 S.W.2d 387 (Tex.Sup.1968), for a discussion of the rules). This is said to be true even where the call for the adjoiner is an unmarked but ascertainable line of an adjacent survey. Appellant relies primarily upon the exception to the general rule: that if the call for the adjoiner was made through a mistake it may be disregarded and the court would then be free to determine from the intention of the parties and the surrounding circumstances what

would be the correct construction of the survey.

Appellant would have this Court locate the alleged vacancy by beginning with the McDonough Tract No. 9, some seven or eight miles northwest of the Traviesa and figure exactly the called distances in each survey down the Guadalupe River to the Vairin for the beginning of this vacancy on the north. He would then have us begin again at the confluence of the Guadalupe and San Antonio Rivers and proceed in the opposite direction to the northwest line of the Traviesa for the southerly side of the proposed vacancy, leaving the excess in between as vacant land. Appellant does not cite a single case in support of his theory that the Vairin can be legally constructed from a point in the McDonough. He merely assumes that it can be done. If the McDonough is to be used for locative purposes, it can only be on a system theory, which precludes a vacancy since the Trav-

iesa Grant is made a part of that system by the calls for adjoinder and the numbering system as is discussed later in this opinion. Here if you began with the McDonough No. 9 where the grant is now recognized as being located, and proceeded down the river to the Traviesa, giving each grant in between the exact distance called for in the original grants of 1834, there would be an excess. Appellant would then accumulate and place this excess between the Vairin and the Traviesa and say "This is the mistake." However, there was no evidence that the location of any of the grants was ever determined originally, by beginning with the McDonough No. 9 and measuring down the river. In fact, the evidence is to the contrary.

The defendants introduced two charts into evidence. Relevant portions of these charts are reproduced here to show graphically that the 18 grants were actually a system of grants. (See Plats 3 and 4). A

| Tract No. | |
|---|---|
| 18 | On N.W. by vacant land<br>**DALY**<br>On S.E. by Bartlett |
| 17 | On N.W. by Daly<br>**BARTLETT**<br>On S.E. by Townsend |
| 16 | On N.W. by Bartlett<br>**TOWNSEND**<br>On S.E. by Rene |
| 15 | On W. by vacant lands<br>**RENE**<br>On S.E. by Cobarrubias |
| 14 | On N.W. by Sand Creek & Rene<br>**REYNOLDS**<br>On S.E. by Rodriguez |
| 13 | On N.W. by vacant lands<br>**COBARRUBIAS**<br>On S.E. by Gallardo |
| 12 | On N.W. by vacant lands<br>**GALLARDO**<br>On S.E. by Francisco Hidalgo |
| 11 | On N.W. by Gayardo<br>**FRANCISCO GONZALES HIDALGO**<br>On S.E. by Galban |
| 10 | On N.W. by Hidalgo<br>**GALBAN**<br>On S.E. by McDonough |
| 9 | On N.W. by vacant lands<br>**McDONOUGH**<br>On S.E. by Gonzales |
| 8 | On N.W. by McDonough<br>**GONZALES**<br>On S.E. by Rodriguez |
| 7 | On N.W. by Gonzales<br>**RODRIGUEZ**<br>and |
| 6 | **NIRA**<br>On S.E. by vacant land |
| 5 | On N.W. by Nira<br>**RAMON**<br>On S.E. by Fernet |
| 4 | On N.W. by Ramon<br>**FERNET**<br>On S.E. by Vairin League |
| 3 | On N.W. by Fernet<br>**VAIRIN**<br>On S.E. by Travieso |
| 2 | On N.E. by Citizen<br>**TRAVIESO**<br>On S.E. by Jose Maria Valdes |
| 1 | On W. by Priest Valdez & N. by vacant land<br>**VALDES**<br>On E. by Guadalupe River |

PLAT 3
[A703]

All dates in the order below were between
September 17, 1834 and November 30, 1834.

| NAME AND TRACT NUMBER | ORDER OF APPLICATION | ORDER OF REFERENCE TO EMPRESARIOS | ORDER OF APPROVAL OF EMPRESARIOS | ORDER OF ADJUDICATION OF TITLE |
|---|---|---|---|---|
| 18 DALY | 14 | 14 | 14 | 17 |
| 17 BARTLETT | 12 | 13 | 13 | 16 |
| 16 TOWNSEND | 13 | 12 | 12 | 15 |
| 15 RENE | 10 | 10 | 4 | 10 |
| 14 REYNOLDS | 18 | 18 | 18 | 18 |
| 13 COBARRUBIAS | 17 | 17 | 17 | 9 |
| 12 GALLARDO | 8 | 8 | 9 | 14 |
| 11 HIDALGO | 7 | 7 | 8 | 3 |
| 10 GALBAN | 6 | 6 | 2 | 13 |
| 9 McDONOUGH | 11 | 11 | 10 | 7 |
| 8 GONZALES | 3 | 3 | 7 | 6 |
| * 7 RODRIGUEZ | 2 | 2 | 6 | 5 |
| * 6 NIRA | 1 | 1 | 5 | 4 |
| 5 RAMON | 9 | 9 | 11 | 8 |
| * 4 FERNET | 16 | 16 | 16 | 12 |
| * 3 VAIRIN | 15 | 15 | 15 | 11 |
| 2 TRAVIESO | 5 | 5 | 1 | 2 |
| 1 VALDES | 4 | 4 | 3 | 1 |

The confluence of
San Antonio and
Guadalupe Rivers.

* The order was actually the same as its *'d
neighbor as both grants were contained in same
application and title.

PLAT 4

[A704]

study of these charts clearly discloses this intent of the parties from the surrounding circumstances then existing. The undisputed evidence in the record substantiates this. In a forty-three day period between October 8, 1834 and November 30, 1834, Vidaurri issued 18 grants bordering on the Guadalupe River and Coleto Creek. By almost identical language each tract is locatable only by bounding on adjoining calls for other grants. This is proven true by a study of Plat 3 which lists the 18 various grants beginning at the confluence of the San Antonio and Guadalupe Rivers with Valdez as No. 1, and extending northwesterly into what is now Goliad County to Tract No. 18, the John Daly. Dates of the application by each owner, dates of reference to the empresarios, dates of approval of empresarios, and dates of adjudication of the title, in the most part, had no particular order. The system of grants and the adjudication of titles to the colonists are again likened to a sale of lots in a farm subdivision. No particular order of sale was followed although each lot either had a number, name or other identification. Here not all of the grants (lots) had numbers, so reference to its neighbor on either side was used for identification. On Plat 4, the order of each is listed. For instance, Traviesa (Tract No. 2) was No. Five in order of its application and reference to the empresario, but it was the first tract to be approved and the second to be adjudicated title. Gonzales No. 8 was No. Three in its application and order of reference, and was seventh in approval and sixth in title adjudication; and so on.

A close study of the applications for title shows that some of the grantees made application for their tract of land and made reference to a named neighbor as an adjoining call, even before that neighbor had made his application or received title. For instance, the McDonough Tract No. 9, was eleventh in application, tenth in approval and seventh in adjudication. However, McDonough's neighbor on the south was one of the first to make application for title and asked in his application to be joined on the northerly side by McDonough. McDonough's neighbor on the north also made application for title before McDonough and he called to be bounded on the south by his neighbor McDonough. When McDonough finally made his application for a grant of land he named his neighbor on the south, but called for vacant land on the north. But to clarify and make certain the location of his tract of land, McDonough asked for "No. 9 on the surveyor's plat". He stated that he had been a resident of the colony for six years and that:

"* * * I was introduced in this Colony with the intention of belonging to it by agreement with its Empresarios, and with this assurance having chosen one league of land on the Guadalupe River and Coleto Creek, Number 9 on the surveyor's plat, I ask and beg you please to order that I be given that which corresponds to me as a married man; this being justice that I implore, I swear, etc."

He was granted the ninth survey northward from the confluence of the two rivers. (See Plat 2.) The McDonough application and grant verifies the undisputed fact that when the application was made therefor on October 11, 1834, there was a surveyor's plat in existence on which the McDonough survey was named as No. 9.

When Vairin and Fernet petitioned for their grants on October 20, 1834, they applied for surveys Nos. 3 and 4. Their application and grant reads as follows:

### APPLICATION

"Agustin L. Fernet, for himself and for J. Vairin, for whom he is attorney, by virtue of Article 16 of the law of March 24, 1825 has the honor of stating to you that it is the wish of each of them to establish themselves in the Colony of Senor Power, as Colonists with their families; and for that reason, I beg that you may have the kindness to concede to them the amount of land authorized by articles 11 and 16 of said law, taking into

consideration their desires to establish themselves on the Guadalupe River. Said Fernet taking League No. 4, bound on the north by the Guadalupe River, on the south by the Senor Priest, on the east by League No. 3, and on the west by Don J. Ramon. Said Vairin taking League No. 3, bound on the north by the Guadalupe River, on the south by the Senor Priest, *on the east by Dona Josefa Travieso,* and on the west by League No. 4." (emphasis supplied).

## THE GRANT

*"The one designated as No. 3,* belonging to Vairin, has 2,750 Mexican varas frontage on the Guadalupe River, and depth along the upper part 10,780 varas, and along the lower 8,790 varas, closing the figure was a line of 3,000 varas running from east to west, and another north to south with 760. It is bound on the northwest by lands of the aforesaid Fernet, on the southwest by lands occupied by the Priest Valdes, on the southeast *by the league of Dona Josefa Travieso,* and on the east by the afore-mentioned river. The one designated as No. 4 is composed of 3,000 Mexican varas frontage on the Guadalupe River, and depth on the upper part 10,240 varas, and on the lower 10,-780 varas, closing one half at the back with a line from east to west of 2,240 varas and the other from south to north with 2,000 varas. It is bound on the northwest by lands of Francisco Ramon, on the southwest by the afore-mentioned Priest, on the Southeast by the Vairin league, and on the northeast by the Guadalupe River." (emphasis supplied).

■ These grants demonstrate that there was a number system beginning with the J. M. Valdez survey and going upriver, making Vairin No. 3, Fernet No. 4, and McDonough No. 9. This numbering system (at least 1 through 11) is shown in part on the very early maps introduced as P. Ex. 109, being a map appearing in Atlas A, page 1, of the Land Office records and also in part on plaintiff's exhibit 17 (see footnote on Plat 2). Although there is no evidence that any of these early maps were actually the original surveyor's plat, they do show a recognition of the early numbering system which apparently did appear on the original surveyor's plat. Many of the grants in the various adjudications refer to the land "according to the survey made by one of the appointed surveys." If it be true, as contended by appellant and the State, that each grant was not separately and completely surveyed, then such references in the grants to a survey and numbering system would establish, in the absence of direct evidence to the contrary, that these colonial grants were surveyed as a part of a system of grants. At this late date the making of such a survey is not open to question.

Modern technology and present day instrumentation demand that interspace travel be errorless. A slight error of a few feet or a miscalculation of a fraction of a degree is unacceptable today. Yet only 135 years ago excesses in measurement and errors in direction indicators (compasses) and other crude instruments were common. Their use without allowances for deviation or variation was an acceptable practice. The judiciary recognizes that these Mexican grants generally contained excesses and that the measuring devices used in olden days were the cause of acceptable errors. So from the very earliest time evolved rules of law that account for the intent of the grantors and the parties themselves.

The area of the 18 surveys covered more than 70,000 acres. The distance was over 100,000 feet fronting on the Guadalupe River and Coletto Creek. In the short time between September 17, 1834, the date of the earliest application, and November 30, 1834, the date of the last grant, all of this land (plus the Serna's Grant adjoining this system on the southwest) had to be surveyed. The area involved was semi-tropical low land, open prairie, with running rivers, dry lakes, bluffs, swamps, motts, lagoons and timber lands. It has been reported that some of these distances in some surveys in the early 1800's, were measured with the

use of a wagon wheel with a rope tied around the rim. Someone was appointed to count the revolutions of the wheel to determine the distance involved. Others reported the use of a waxed rope called a cordel, well stretched and based upon fifty varas, measured 4 castilian palms per vara. Whatever the measurement employed, this particular system of surveys was locatable by almost identical language in each grant by bounding and adjoining calls with other grants.

If, after November 30, 1834, when Tract No. 14 was adjudicated last out of the 18, this suit had been filed for a determination of an accurate location of all of these grants, there would be no question that the excess in this system of 18 tracts would have been found between John Daly No. 18 and the vacant land to the northwest and beyond Tract No. 18. If anyone is concerned about where to put the excess now, which appellant contends exists, it would be just as reasonable to assign it to some other place among the 18 tracts than to place it between Traviesa No. 2 and Vairin No. 3, as contended by the appellant. It would even be more logical to prorate the excess equally among the 18 tracts or assign it along part of the 18 tracts on the opposite side from Guadalupe River, where in most cases the description called for vacant land on the southwest side, rather than pulling apart two adjoinder calls fixed by identical lines and bounded on the other side by a natural object (the river).

■ Appellant however, must contend in order to create a vacancy, that one particular call for an adjoinder was a mistake at the place he assigns it. To do this it was essential that appellant prove by strong, cogent and clear evidence that the call in the Vairin-Fernet grant for the Vairin to be bounded on the southeast by the Traviesa was a mistake and that such call should not be considered for any purpose, and that the call for area and distance should govern. Wyatt v. Foster, 79 Tex. 413, 15 S.W. 679; Booker v. Hart,

77 Tex. 146, 12 S.W. 16; Miller v. Meyer, Tex.Civ.App., 190 S.W. 247.

■ Appellant asserts that there is evidence of an excess of land and distance between the McDonough and the Traviesa and therefore this raises a fact issue of a vacancy. Such excess is no evidence of mistake or of a vacancy. State v. Balli, 144 Tex. 195, 190 S.W.2d 71 (1944); Foster v. Duval County Ranch Co., Tex. Civ.App., 260 S.W.2d 103 (1953, wr. ref. n. r. e.); State v. Indio Land & Cattle Co., Tex.Civ.App., 154 S.W.2d 308 (wr. ref. w. o. m.). Nor do variances in distance account for a mistake. Frost v. Socony Mobil Oil Company, Inc., supra; Freeman v. Mahoney, 57 Tex. 621; Standlee v. Burkitt, 78 Tex. 616, 14 S.W. 1040; Worthington v. Boughman, 84 Tex. 480, 19 S.W. 770. As pointed out in State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228 (Tex.Com'n App., 1936 op. adopted):

"* * *· inconsiderable excess is not of itself evidence that the surveyor was mistaken in the location of the adjoinder for which he called, but, when there is no other evidence of mistake, (it) is usually, * * * taken to mean that the mistake was in the measurement or in the calculation of the distance. Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.2d 773, Tex.Sup.Ct."

But even if we considered for the sake of his contention that the call for adjoinder was a mistake, appellant doesn't demonstrate what otherwise was the intent of the parties (grantor-grantees), he doesn't show what should have been the situation considering the surrounding circumstances existing at the time. See C. M. Frost, et al. v. Socony Mobil Oil Company, Inc., supra. He doesn't attempt to retrace the footsteps of the original surveyor. Did the original surveyor intend to put another tract between the Vairin and Traviesa; if so, what was its number? Was it No. 2½ or was it number 19? Appellant offered no such evidence.

Appellant's proposed vacancy fails for another reason. It is located by the appellant within the external lines of a system of contemporary surveys, and is therefore in conflict on the ground with lands previously titled. It is not subject to appropriation under Article 5421c, Vernon's Ann.Civ.St. Under the undisputed evidence, the Traviesa and Vairin Grants are within this system of 18 surveys. Until the entire system is surveyed, no interior line can be located. There can be no vacancy in construing interior lines in a system of surveys. Excess in the system or block would have to be prorated or decided in some other manner than that proposed by the appellant. Welder v. Carroll, 29 Tex. 317 (1867); Humble Oil & Refining Co. v. Campbell, 350 S.W.2d 364 (Tex.Civ.App.—Beaumont 1961, ref. n. r. e.); Duval County Ranch Co. v. Rogers, 150 S.W.2d 880 (Tex.Civ.App.—San Antonio 1941, wr. ref.); Carmichall v. Stanolind Oil & Gas Co., 256 S.W.2d 129 (Tex.Civ.App.—Amarillo 1952, wr. ref.); Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801, 129 Tex. 547, 104 S.W.2d 1 (1937); Austin v. Espuela Land & Cattle Co., 107 S.W. 1138 (Tex.Civ.App.1908).

For a tract of land to be vacant it must be unsurveyed public land and it must not be in conflict on the ground with lands previously titled, awarded or sold. Atlantic Refining Co. v. W. D. Noel, 443 S.W.2d 35 (Tex.Sup.1968). Unsurveyed land has been defined in Section 3 of Article 5421c V.A.C.S. to be all areas not included in surveys on file in the General Land Office or surveys delineated on the maps thereof. The burden was on appellant as plaintiff in the trial court, to create by evidence, a material fact jury issue that one or more of the strips of land claimed by him as vacant, untitled land, had not been included in grants made by the sovereign. The term "titled" is not defined in Article 5421c V.A.C.S., but land is titled within the meaning of the article if a grant or patent is issued which on its face is evidence that the State or former sovereignty has parted with its right, and conferred such right on the grantee. Later the grant might be held to be void or voidable, but the land embraced within it originally, is nevertheless titled land. Winsor v. O'Connor, 69 Tex. 571, 8 S.W. 519 (Tex.Sup.1888). Therefore, it is unimportant where the exact inner boundary lines are located, as far as the appellant is concerned. If the land had previously been titled, it cannot be vacant and the location of such boundary lines are of interest only to the landowners thereof. What the adjoining landowners at any later time may have agreed upon as survey lines between their ownership is not probative evidence of where the lines were originally located when the grants were made. Long recognition by owners of adjacent surveys of certain lines as fixing the boundaries of the surveys cannot in any way affect public domain or appropriate any portion of it any more than such recognition could donate any land back to the State. See Weatherly v. Jackson, 123 Tex. 213, 71 S.W.2d 259 (Tex.Comm'n App.1931); Humble Oil & Refining Co. v. State, 162 S.W.2d 119 (Tex.Civ.App.—Austin 1942 error ref.). At the time that the State of Coahuila and Texas enacted the Colonization Law, and at the time when these 18 grants obtained their validity, the State of Texas had not come into existence. The old Colonization Law determines the extent and validity of the grants. Motl v. Boyd, 116 Tex. 82, 286 S.W. 458 (Tex.Sup.1926).

Appellant argues that the fixed beginning point at McDonough was decided in Fagan, et al. v. Stoner, et al., 67 Tex. 286, 3 S.W. 44 (1887). This suit was a private boundary dispute and did not involve the question of what area had been severed from public domain. The Supreme Court held only, that the evidence was sufficient to uphold the trial court's finding that the upper of two disputed lines was the true lower boundary of the McDonough (Tract No. 9). The case

itself on the other hand, established that the McDonough line was not a known and established line in 1834, and was not set or established until the lawsuit made it so in 1887, some fifty-three years after the original grant. Although Fagan v. Stoner fixed the McDonough once and for all, as far as its adjoining neighbors were concerned, it didn't determine the boundary of the other tracts in the system as they existed in 1834. The original McDonough tract was not locatable then by any more certain description than the chosen No. 9 tract. McDonough was not located by some precise course and so many varas distance from the center of some known plaza north of him (i. e. La Bahia); nor was it locatable by so many varas along the course of the river measured from the confluence of the rivers involved. Therefore, no call of distance from the McDonough can now be given any dignity to locate any other original survey in this system. This general rule of law is still recognized in Texas. Yet under appellant's theory, he would hold each grant to the precise called distance measuring downward from this McDonough tract rather than attempting to honor the system of surveys portrayed on the "surveyor's plat" which evidenced the intent of the Colony Commissioner for the Power & Hewetson Colony who issued the grants bordering the Guadalupe River and the Coleto Creek and called for the adjoinder with each other.

The general rules of evidence concerning boundary questions require that we go to the nearest fixed object which was established at the time the grants were made in 1834. That would be the confluence of the Guadalupe and San Antonio Rivers. This point is much nearer to the proposed vacancy, and is the only natural object that could be established with certainty in 1834 and again today. It is untenable to go to the McDonough now for a beginning point in the system of surveys when the McDonough boundary wasn't known with certainty until later, (and not then in reference with the other surveys) and in addition was several times as far removed as the rivers.

■ Another rule of construction would require the locating of the Vairin by going to the nearest established point of the line referred to in the grant. Since the Vairin grant calls for adjoinder with Traviesa, the Traviesa should be the beginning call of the Vairin. Harrison v. Manvel Oil Co., 142 Tex. 669, 180 S.W.2d 909 (Tex.Sup.1944); Maddox v. Turner, 79 Tex. 279, 15 S.W. 237; Matador Land & Cattle Co. v. Cassidy-Southwestern Commission Company, 207 S.W. 430 (Tex. Civ.App.—Ft.Worth n. w. h.); Jones v. Burgett, 46 Tex. 284; Randall v. Gill, 77 Tex. 351, 14 S.W. 134. It cannot be said that the location of the Traviesa on the northwest line is uncertain, as the appellant pleaded the position exactly and introduced evidence as to where it was recognized to be located. Although the appellant pleaded an alternative position of the Traviesa northwest line he also pleaded the alternative line with certainty. Appellant therefore concedes the location of the Traviesa, as he must, to locate his proposed vacancy.

■ The State's colonization law generally permitted each setttler one league of land. Appellant contends that since Vairin was entitled to only one league of land and since the Vairin tract as now constructed contains an excess of land, the original surveyor must have been mistaken when he called for the adjoinder with the Traviesa. Appellant argues that it was presumed in those olden days that the surveyors would follow the law and therefore the call for the adjoinder is an error. This contention also fails for a number of reasons. First, the Colonization Law had many directives. Of equal import as the admonition to the surveyor to not survey more than one league of land, was the law that required the surveyor to cite the adjoining landowners and to survey the tracts so as to not leave any vacancy.

## COLONIZATION LAW OF MARCH 24, 1825

"Sec. 4.—Issuing Land Titles.—He shall issue the land titles in the name of the state, in conformity to the law, giving the new settlers possession of the same in legal form, and previously *citing the adjoining proprietors, should there be any.*

\*     \*     \*     \*     \*     \*

"Sec. 6.—Vacant Lands—Landmarks.— *He shall adopt the necessary measures that no vacant lands be left between possessions,* and in order that the limits of each one may be known at first sight, he shall oblige the colonists to set landmarks upon their lands within one year, with fixed and permanent boundaries." Sayles' Early Laws of Texas, Vol. 1, pages 73 and 74. (Emphasis supplied).

The instructions from the Executive Department of the State of Coahuila and Texas to the Commissioner for the Distribution of Lands to the new colonists, and particularly Sec. 6, ("He shall adopt the necessary measures that no vacant lands be left between possessions \* \*") would not be consistent with appellant's theory of vacancy. River lands in the early days were the choice lands, and it is difficult to believe that a mistake was made as to the common line between the Traviesa and Vairin. As far back as 1856, Justice Hemphill took notice of this in his opinion in Williamson v. Simpson, 16 Tex. 433, 434, when he said:

"It is not to be conceived that river lands, in this age of enterprise and land scheming, would have been so long neglected, if in fact they were vacant and had not been known to have been granted. This presumption would not hold on a frontier where lands were inaccessible, but is very reasonable in the settlements and where the titles to lands are more or less notorious."

In order to ascertain the intent of the original surveyors certain calls are considered to be more reliable, more important and therefore of higher dignity than others. Under such rules of evidence, calls ordinarily are given priority in this order: (1) Calls for natural objects such as rivers, (2) calls for man-made monuments, adjoinders and corners, (3) calls for course and distance, and (4) calls for quantity or acreage. If you adopted the same priority as to the colonization laws, certainly the directive in Sec. 4 calling for titles to cite the adjoining proprietors, and Sec. 6 which called for monuments and measures that left no vacancy between tracts, would take preference over the directive in Articles 11 and 16 which calls for a certain quantity, i. e., one league.

Since the law provided that the land title should cite the adjoining properties, the Vairin surveyor did just that. The Vairin tract cited the Fernet on the northwest; it cited the Traviesa on the southeast; it named the Priest Valdez' lands on the southwest and closing it called for the Guadalupe River on the east. In addition the grant named the Traviesa's upper line to the exact vara. It named the Fernet's lower line to the exact vara. It is most unlikely that there would be any other place measured away from the Guadalupe River where the lateral distance would be identical as it is here, and leave vacant land in between.

The Vairin Grant therefore contains not merely one call for a boundary with the Traviesa, but five calls: (1) the application calls for the land to be bound "on the east by Dona Josefa Travieso", and the adjudication confirms this by awarding to each grantee their lands "in accordance with their request"; (2) the adjudication calls for the land to be on the "southeast by the league of Dona Josefa Travieso"; (3) the application calls for this to be "League No. 3, and for the Fernet to be No. 4." Before this, on October 11, 1834, McDonough had applied for the league "No. 9 on the surveyor's plat", thus indi-

cating this plat to be in existence and known to the settlers at the time of the Vairin-Fernet application on October 20. It is also clearly indicated that the Traviesa was League No. 2, as is shown on one of appellant's exhibits (See Plat 2 supra); (4) the grant itself likewise shows the Vairin to be League No. 3, and the Fernet to be No. 4. It is further significant that the land granted to Vairin (No. 3) was mentioned ahead of the grant of land awarded to Fernet (No. 4) thus indicating a southerly (from the confluence of the river) to northerly approach. (See grant copied hereinbefore); (5) the length of the southeast line as recited in the Vairin grant is 8790 varas.

■ The law is well settled in this state that when the line of a junior survey is called to be identical with that of a senior survey the location of the senior line is conclusive of the location of the junior line. Strong v. Delhi-Taylor Oil Corp., 405 S.W. 2d 351 at 375, and cases cited therein (Tex. Civ.App.—Corpus Christi 1966, ref. n. r. e.), and "that extraneous evidence is incompetent to pull them apart." Citing authority. It must be remembered that the Vairin tract (or the Fernet) never did call for the McDonough. Since the northwest line of the Traviesa was established, there is no other place to go to locate the southeast line of the Vairin. Harrison v. Manvel Oil Co., 142 Tex. 669, 180 S.W.2d 909 (Tex.Sup.1944). Even if a line was lost you would still go to the nearest known corner (the north corner of the Traviesa) which would get you back to the Traviesa boundary. Matador Land & Cattle Co. v. Cassidy-Southwestern Commission Company, 207 S.W. 430 (Tex.Civ.App.—Ft. Worth 1918 n. w. h.); Jones v. Burgett, 46 Tex. 284 and Randall v. Gill, 77 Tex. 351, 14 S.W. 134.

■ A study of the various applications convinces us that the citizens of the colony were placed in juridical possession of the various grants. Many were previous settlers who had built homes and established settlements up and down the river. The tracts were known by the names of the original owners. The Vairin-Fernet Grant recited that "placing him in possession of that which he represents for himself and his principal of the leagues of land which he has designated, he has taken quiet and peaceful possession, in which act he had made all the necessary demonstrations of true ownership." If there are doubts as to the extent of the boundaries of these Mexican grants they are resolved by the act of juridical possession. State v. Balli, 144 Tex. 195, 190 S.W.2d 71 (Tex.Sup. 1944). Juridical possession is shown by the evidence of the grants themselves. From the applications and the grants it is evident that some of the various tracts had been allotted and applied for on the basis of a surveyor's plat numbering from the confluence of the rivers northwestward. (See Plat 2).

■ The descriptive language in the grants described how the grantor placed the parties in possession. The language in the grants, by calling for adjoinder to the adjacent tract, were in effect tacking possession to possession according to the plat. It was said in the case of White v. Holliday, in 1854, 11 Tex. 606, that:

"It adjudges to the grantees the title and possession of the land, which had been surveyed for them by a surveyor appointed for that purpose; the Commissioner recites that he put the grantees in possession, performing all the acts of true possession; and he formally executed to them the title. There remained no act to be done on the part of the government to complete the title; no further act of confirmation or investure of title was contemplated or required by the law; and nothing further was requisite to vest in the grantees a perfect title."

In the case of State v. Russell, 38 Tex.Civ. App. 13, 85 S.W. 288, 289, 294 (Tex.Civ. App—1905 wr. ref.), it is said:

"* * * if there should be any doubt as to which of the calls should prevail, that for course and distance or that for

the north line of the Santanita, it should be resolved in favor of the long-asserted right under the juridical possession which is shown in this case. * * *"

In State v. Sais, 47 Tex. 307, 314, the Court said:

"* * * the procedure was outlined which the congress of Tamaulipas in Decree 24 of the 19th of October, 1833, required under its law. Under the earlier laws of Tamaulipas the procedure was substantially the same. We have found no instance of a grant by the State of Tamaulipas where the survey and visual inspection did not precede the act of juridical possession and the final concession of title, which is equivalent to a patent under the later Texas laws. The act of juridical possession has always been considered a juridical construction or interpretation of an earlier survey."

Here the lands in question were titled and the grants have not been cancelled or annulled. The long, continued undisturbed and uncontested occupancy of one hundred thirty five years beginning with juridical possession and the adjoinder calls on either side, precludes the existence of any vacancy as defined by Article 5421c, V.A.C.S.

Appellant's alleged B and C vacancies are dependent upon the fact that they are unappropriated public free school lands, never patented and subject to appellant's application for a vacancy. Appellant contends that the four-league grant made by the Mexican State of Coahuila and Texas to the Priest Jose Antonio Valdez cannot be locatable by identifiable objects. In addition, appellant's case is dependent upon a construction of the Traviesa Grant in such a way that it would conform to the Cameron two-league grant which was carved out of the Priest's land and later held to be void grant. The evidence in this southern area near the confluence of the Guadalupe and San Antonio Rivers is not now clear and certain. Many facts that were readily available to the original gran-

tees and the surveyors are obscured by the passage of time. Appellant's theory of this vacancy fails if for no other reason than his supposition that the Traviesa Grant called for the back line of the Cameron. This is not so as the evidence is that the Cameron is either junior to the Traviesa or that neither the Cameron nor the Traviesa knew of each other's existence at the time titles issued. In any event, if there is a conflict between the back lines of the Traviesa and the claimed back lines of the Cameron, the area of this overlap is appropriated public land. There is nothing in the Traviesa field notes to limit her grant by any back lines of the Cameron.

Commissioner Vidaurri vested Maria J. Traviesa with juridical possession of the boundaries of her land and the subsequent grant to Cameron did not affect the Traviesa boundaries. The act of juridical possession is recited by Vidaurri in the following words:

"Therefore, exercising my authority and in the name of the Supreme Powers of the Mexican Nation and of the State, I put her in possession of it, which she took quietly and peacefully without any contradiction and performing all the acts of true possession, with the understanding that she will comply with the requirements of the colonization law of March 24, 1825; * * *"

Appellant's contention that various land office maps support the existence of a vacancy is mere speculation. These maps may show some excess but in this case are not probative evidence of a vacancy as of the time of these grants in 1834. As stated by Chief Justice McClendon in Humble Oil & Refining Co. v. State, 162 S.W.2d 119 (Tex.Civ.App. 1942, wr. ref.), where an instructed verdict was affirmed: (p. 133)

"Land Office maps do in proper cases furnish evidence of boundary locations. See 7 Tex.Jur. p. 232, § 76. But after all, such maps are but compilations by Land Office officials from records in

that office, and as such are but conclusions of those officials as to the effect of the records. Where, therefore, as here, the records are in evidence, the maps cannot be given evidentiary significance beyond that which the records warrant. This subject is very ably treated, with citation of authorities, in the case of Weatherly v. Jackson, 123 Tex. 213, 71 S.W.2d 259, 264, wherein it was held that *'the state may not be "mapped out" of land owned by it even though the map may be made in the state's General Land Office.'* (emphasis supplied)

■ Evidence of actions of officials, parties, surveyors, or others taken subsequent to the grants would not be evidence of where the original survey lines were as against unimpeached recitals in the grants calling for adjoinder and as against the presumed regularity of official acts. In this connection, the earliest maps of the area, an 1841 map (See Plat 2) shows no excess and no vacancy in the Vairin area. The excess was put in later maps. There is no evidence that in attempting to place the lower boundary line of the Vairin so as to establish the "A" vacancy, appellant was following in the footsteps of the original surveyors.

■ Many of appellant's points of error concern evidence excluded by the trial court. For instance appellant attempted to introduce into evidence the decision in Fagan v. Stoner, 67 Tex. 286, 3 S.W. 44 (1887) contending that the location of the McDonough was fixed in that case as a matter of law. The trial court did not err in refusing to admit this evidence since Stoner's land was not in the chain of title to the lands owned by the defendants, nor were defendants parties to that suit. Other points involved evidence of possession of certain surveys other than the original surveys, or statements as to location of certain surveys, hearsay statements of parties. Such testimony was irrelevant to any issue in this case. Reviewing appellant's points relative to the excluded evidence, such evidence did not

have any probative value for the purpose of establishing a vacancy. If there was any error it was harmless. Rule 434, Texas Rules of Civil Procedure. It has been very ably stated by the former Chief Justice of the San Antonio Court of Civil Appeals, Justice W. O. Murray, now retired, in State v. Indio Cattle Co., 154 S.W.2d 308 (err. ref. w. o. m.).

> "In boundary, excess or vacancy suits involving old grants and old surveys, where no living witness can testify as to original conditions and facts, the courts wherever there is specific, definite evidence of facts existing as of the date of the grant or survey, as opposed to general, indefinite or descriptive evidence, decide such cases usually as a matter of law rather than fact." (citing authorities)

We have considered all of appellant's points of error and they are overruled. Appellees' amended motions for rehearing are granted.

The judgment of the trial court is affirmed.

GREEN, Chief Justice (concurring).

After having considered appellees' motions and amended motions for rehearing and the briefs in support of and opposing such motions, and after a further review of the record and all briefs submitted prior to the rendition of the original majority opinion, I have concluded that I was in error in joining in the reversal of this cause. I am now convinced that the trial court did not reversibly err in granting the instructed verdict and in rendering judgment for appellees. I concur in Judge Nye's opinion, and join with him in granting appellees' amended motions for rehearing and affirming the judgment of the trial court.

The briefs of appellant present one hundred thirty three points of error divided into groups directed to the alleged A vacancy, B vacancy, C vacancy, alternate A vacancy, and evidentiary matters. I do not consider it necessary to discuss particu-

lar points. Applying appropriate principles of law to the facts, as was done in Judge Nye's opinion, I agree with his conclusions that none of said points of error and the statements and arguments of appellant thereunder reflect reversible error. Since the primary issue involves the correctness of the directed verdict, and therefore requires consideration from the viewpoint most favorable to appellant of all the evidence of probative value, whether actually admitted or proffered and erroneously excluded, my conclusions are drawn from a consideration of all the evidence, admitted or excluded, which is reviewed and discussed in the briefs on file. It therefore becomes unnecessary to pass upon the points alleging reversible error in the exclusion of evidence proffered by appellant but not admitted by the trial court.

Appellant in order to be successful must locate on the ground an area which is unsurveyed and not in conflict with titled lands, meaning lands covered by prior surveys and grants. If an area is included within a previous survey or grant, it cannot be vacant. Art. 5421c, V.A.T.S.; Atlantic Refining Co. v. Noel, Tex.Sup. Ct., 443 S.W.2d 35, 38. The vacancy must be established *as of the time of the grants,* and *no* act, agreement, agreed line, occupation line, map, drawing, sketch or anything done by the owners, claimants, surveyors, or representatives of the State can change the original location of the grant lines to any degree. Proctor v. Markham, Tex.Civ.App., 271 S.W.2d 685, wr. ref. n. r. e.; Weatherly v. Jackson, 123 Tex. 213, 71 S.W.2d 259, op. adopted; Humble Oil & Refining Co. v. State, Tex. Civ.App., 162 S.W.2d 119, wr. ref.; Tippett v. Woolley, Tex.Civ.App., 230 S.W. 2d 283, wr. ref. n. r. e.; 9 Tex.Jur.2d p. 591, Boundaries, § 53. The statement that various Land Office maps support the existence of a vacancy is mere speculation. These maps may show some excess, but in this case they are not probative evidence of the existence of the claimed vacancy in 1834 after the Vairin and Fernet grants

had been made. See quote in and near the end of the opinion of Judge Nye, Humble Oil & Refining Co. v. State, *supra,* where an instructed verdict was affirmed.

Evidence of actions of officials, parties, surveyors or others taken subsequent to the grants would not be evidence of where the original survey lines were as against unimpeached recitals in the grants calling for adjoinder and as against the presumed regularity of official acts. In this connection, the earliest maps of the area, the 1841 map, P. Ex. 18–19, and the Atlas A Page 1 map, P. Ex. 17, show no excess and no vacancy in the Vairin area. The excess was put in later maps. And, as stated in Judge Nye's opinion, there was no evidence that in attempting to place the lower boundary line of the Vairin so as to establish the "A" vacancy, appellant's claimed line was following in the footsteps of the original surveyor.

Although appellant takes the position that the Traviesa northwest line is firmly established, and is the southeast line of "A" vacancy, he bases his contention that the call in the Vairin for adjoinder with that line should be given no significance in part on his proposition that the said line is an "unmarked prairie line". In Maddox v. Turner, 79 Tex. 279, 15 S.W. 237, the Court said:

"When unmarked lines of adjacent surveys are called for, and when, from the other calls of such adjacent surveys, the position of such unmarked lines can be ascertained with accuracy, and when, in the absence of all evidence as to how the survey was actually made, there arises a controversy as to whether course and distance or the unmarked line of another survey shall prevail, we see no good reason why the survey line should not be given the dignity of an 'artificial object,' and prevail over course and distance. * * * "

See, also, Gulf Production Co. v. Camp, Tex.Civ.App., 32 S.W.2d 881, aff'd 122 Tex. 383, 61 S.W.2d 773; Wolf v. Scott,

Tex.Civ.App., 253 S.W. 905, n. w. h.; Matador Land & Cattle Co., Limited v. Cassidy-Southwestern Commission Co., Tex.Cix.App., 207 S.W. 430, n. w. h.

Appellant's essential position with reference to his alleged A vacancy was that the call in the Vairin that it should bound on the southeast by the league of Dona Josefa Traviesa was made through mistake, and should now be held to be entirely void and of no effect. C. M. Frost et al. v. Socony Mobil Oil Co., Inc., et al., Tex.Sup., 433 S.W.2d 387. As discussed in Judge Nye's opinion, with which discussion I am in accord, appellant in order to establish his alleged mistake relies on called distances as necessarily coming down from the grants above the Vairin-Fernet (Tracts Nos. 3 and 4 as stated in the grant), and particularly from the lower line of the McDonough (Tract No. 9) as said line was established by the courts in 1887 (Fagan v. Stoner, 67 Tex. 286, 3 S.W. 44). There is no evidence of probative value in the record that in order to establish the lower line of the Vairin (Tract No. 3) as it was granted in 1834, one should start from above and measure downward. This is explained in the majority opinion, and I see no need to expand on the subject here.

I agree with the discussion in that opinion that the evidence was not legally sufficient to raise any fact jury issue of the existence of any of the vacancies claimed by appellant. Appellees' amended motions for rehearing should be and are granted, and the judgment of the trial court should be and is affirmed.

SHARPE, Justice (dissenting).

I respectfully dissent. In my view, the Court correctly reversed the judgment of the trial court and remanded the cause for new trial on the original disposition of the case. I would overrule appellees' motion for rehearing.

The original majority opinion of this Court was authored by this writer and I now file it as a dissenting opinion. There are no changes in substance but minor changes in wording have been made in order to conform the prior majority opinion to its present posture of a dissenting opinion. In my view, the present majority or concurring opinions do not fully state or discuss the contentions of the parties, particularly those of appellant. Nor do such opinions adequately refer to or discuss the evidence admitted or excluded over objection. Many of the authorities relied on by appellant, which I believe strongly support his position and that of the State of Texas, are not mentioned in the other opinions.

The case is now in a different posture since the granting of appellees' motion for rehearing by the majority and reversal of the original disposition by this Court. I will reserve decision on whether additional writing is necessary until consideration of the new motions for rehearing. The original majority opinion of this Court (conformed to and now filed as a dissent, as above-mentioned) immediately follows.

OPINION

This is a vacancy case involving land in Victoria County, Texas. Appellant (plaintiff below) Guerry Strong, pursuant to the provisions of Article 5421c, V.A.C.S., filed two separate mineral applications with the Commissioner of the General Land Office, asserting a vacancy of 4,353.5 acres in application No. MA 56233 and a vacancy of 2,618.94 acres in application No. MA 56234. The applications were denied by the Land Commissioner and suit was thereafter brought by Strong in the 135th District Court of Victoria County, Texas. The trial court granted defendants' motion for directed verdict after plaintiff rested his direct case and thereafter rendered judgment for the defendants.

It is my view that the directed verdict for the defendants-appellees and the judgment based thereon should not have been granted, and the case should be reversed

and remanded for new trial. That holding is based upon two grounds: First, fact issues were raised by the evidence concerning the existence of each of the alleged vacancies; and second, the trial court erred in excluding certain evidence offered by appellant. The reasons for these conclusions will appear in the course of the opinion.

The record herein consists of the Transcript containing 250 pages, the Statement. of Facts containing 2456 pages, and 276 exhibits, many of which are voluminous. The briefs of the parties contain over 700 pages. Appellant asserts one hundred thirty-three points of error, contained in forty-seven printed pages of his brief. Appellees have replied by ten counterpoints, some containing subdivisions.

While the number of named defendants is large, the real parties in interest are not so numerous. The landowner (subject to the vacancy claims) is the J. A. McFaddin Estate (C. K. McCan et al). The major lease claimants are Sunray DX Oil Company, Humble Oil & Refining Company, Socony Mobil Oil Company, Inc., and Shell Oil Company. There are a few other mineral interest holders. All of the adjoining land owners are not involved in the alleged vacancies and were made parties to prevent a contention of absence of parties. It is stipulated that all defendants with any asserted interest in the land situated within the alleged vacancy areas claim under and through J. A. McFaddin.

The land involved in this case was formerly a part of the Mexican State of Coahuila and Texas. That State, pursuant to its Colonization Law of 1825, entered into contracts under dates of June 11, 1828, and April 21, 1830, with James Power and James Hewitson, who were referred to as Empresarios, for the colonization of a large area of land, of which the grants here involved constituted a small portion. Jose Jesus de Vidaurri was the commissioner appointed to issue titles in the Power and Hewitson Colony. The description of the areas embraced in the contracts is shown in Sayles' Early Laws of Texas, Vol. 1, Art. 108. The contracts are discussed in the reported cases of Welder v. Lambert, 91 Tex. 510, 44 S.W. 281 (1898); Hamilton v. Menifee, 11 Tex. 718 (1854).; and Harris v. O'Connor, 185 S.W.2d 993 (Tex.Civ.App., El Paso, 1944, wr. ref. w. o. m.). The courts of this State take judicial knowledge of the contracts. Hatch v. Dunn, 11 Tex. 708 (1854). In this case it is apparent that if title to the lands covered by the alleged vacancies was validly granted under Mexican law while they were a part of the area of that country, such grants will be respected by the succeeding sovereign. On the other hand, if title was not so parted with by Mexico, the former sovereign, then it was succeeded to by the Republic of Texas in 1836 and thereafter by the State of Texas when it became a part of the United States of America in December, 1845.

Plaintiff's Exhibit No. 1 is a plat showing the vacancies sued for here, referred to as the "A", "B", and "C" vacancies. On the original exhibit the vacancy of 4,353.5 acres (the "A" vacancy) is shown as that area between the lower line of the Vairin Grant and the upper line of the Traviesa Grant and is outlined in red. The second vacancy of 2,618.94 acres (the "B" vacancy) is shown on the same original exhibit by the area outlined in blue. There is an area of 460.45 acres (the "C" vacancy), consisting of a triangle, which is located within both the "A" and "B" vacancies. There is also an alternate "A" vacancy (included within the basic "A" vacancy, but covering a smaller area of 1855.3 acres) not specifically shown on the above-mentioned exhibit, which will be later described and discussed separately.

Plaintiff's Exhibit No. 1, greatly reduced in scale, is here set out in part, and designated plat No. 1. The reduction in scale causes many of the names and other nota-

tions thereon to be unreadable. I have therefore, added in typewriting the names and notations which are most material to disposition of the case.

PLAT NO. 1

I also set out as plat No. 2 a smaller portion of plaintiff's Exhibit No. 1, which is on a much larger scale and indicates the alleged vacancy areas by diagonal lines and designations of "A", "B", and "C".

Some of the names and notations have also been added in typewriting. The colors on the original exhibits have necessarily been omitted.

PLAT NO. 2

The briefs of the parties contain slight variations in the recitation of the acreage in the alleged "B" vacancy, such as 2618.94, 2618.34, and 2618.24.

The alleged vacancies require the location of the boundaries of several grants made by the Mexican Government. Three of these were to Father Jose Antonio Valdez, his son Jose Maria Valdez, and his wife, Maria Josepha Traviesa, in the area of the confluence of the Guadalupe River and the San Antonio River. Father Jose Antonio Valdez acquired his priesthood by being a chaplain in the Mexican Army. The other and later grants commenced up the Guadalupe River. Under appellant's theory, the grants beginning with the one made to Edward McDonough (on the Guadalupe River and Coletto Creek where they join) extended successively down that river but never met the Traviesa Grant. All of these grants were made in 1834 under the Colonization Law of 1825, except the 1824 Father Jose Antonio Valdez Grant.

The grants of land which appellant contends are directly relevant to the "A" vacancy are shown on the following table, together with the dates of adjudication of title, river frontage, and their ground order numbered beginning at the San Antonio River on the South and extending generally northwestward up the Guadalupe River.

| Grantee | Date of Adjudication of Title | Frontage on Guadalupe River in Varas | Ground Order |
|---|---|---|---|
| Edward McDonough | Oct. 15, 1834 | 2000 | 9 |
| Juan Gonzales | Oct. 15, 1834 | 2000 | 8 |
| Leonardo Rodriguez | Oct. 15, 1834 | 2000 (In one instrument) | 7 |
| Decidirio Nira | Oct. 15, 1834 | 2000 | 6 |
| Francisco Ramon | Oct. 20, 1834 | 2500 | 5 |
| August L. Fernet | Oct. 29, 1834 | 3000 (In one instrument) | 4 |
| J. Vairin | Oct. 29, 1834 | 2750 | 3 |
| Maria Josepha Traviesa | Oct. 8, 1834 | 4430 | 2 |
| Jose Maria Valdez | Oct. 8, 1834 | Not Given | 1 |

The "A" vacancy is alleged to be located between the lower line of the Vairin and the upper line of the Traviesa. The "B" vacancy is alleged to be a portion of the former Cameron leagues, to be hereafter fully discussed, and is shown on Plaintiff's Exhibit 1 as located in the western portion of the tract designated "Maria Josepha Traviesa." The "C" vacancy is alleged to be located so as to be overlapped by either the basic "A" or "B" vacancies.

## THE POSITION OF THE STATE OF TEXAS

The State of Texas, as intervenor in the trial court, took the position that there should be a full development of the facts in order that the rights of the State and of the Public Free School Fund would be protected, and an Assistant Attorney General participated in the trial. Plaintiff pleaded the issues as to the rights of the Public Free School Fund in two parts: (1) The rights of the State in the land situated

in the asserted vacancies and (2) the rights of the State in approximately 8800 acres of land situated in the two leagues originally granted to Fernet and Vairin, the title to which had allegedly forfeited and reverted to the State by reason of the provisions of the 1825 Colonization Law of the then Mexican State of Coahuila and Texas; this latter issue being relevant to plaintiff's suit in the event either vacancy should be established, as bearing upon the rights which could then be determined under an assertion of a good faith claimant. The adjudication of the latter issue would determine whether the applicant, plaintiff below, should receive an oil and gas lease or only a royalty interest in the vacancies. It would also determine the rights of the State of Texas in the two leagues of land shown by the evidence to contain an extensive oil and gas field. The trial court severed the two issues and ordered the vacancy issue tried first; and this appeal is from the judgment on trial of that issue. Appellant's two applications were consolidated for trial in the Land Office and the court below.

The position of the Attorney General of Texas is that the applicant, plaintiff below, with active cooperation of an Assistant Attorney General in the trial, fully developed facts establishing the existence of the vacancies not merely by a sufficiency of the evidence but as a matter of law to the extent this could be in the absence of any rebuttal evidence by the defendants. It is further the position of the Attorney General that the facts and law as presented in appellant's brief are so conclusive that but for the action of the trial court in directing a verdict, thereby avoiding a full development of the case, the judgment of the court below should be reversed and rendered. Prior to submission and oral argument of the case in this Court the State did not file a brief herein. Thereafter, the Attorney General filed a separate brief which points to the importance to the Public Free School Fund of Texas of the proper disposition of the issues in this phase of the case as well

as those in the portion severed for later trial. The brief of the State is in a relatively short summary form but adopts for all purposes as stating the position of the State the brief filed by appellant Guerry Strong.

## SUMMARY OF CONTENTIONS

Appellant's one hundred thirty-three points of error have been grouped for briefing under ten letter designations of A through J as follows:

### GROUP A

(Points One through Seven, inclusive)

Argument on the merits as to the 4353.5 acre vacancy.

### GROUP B

(Points Eight through Fourteen, inclusive)

Argument on the merits as to the 2618.34 acre vacancy.

### GROUP C

(Points Fifteen through Seventeen, inclusive)

Argument on the merits as to the 460.45 acre vacancy.

### GROUP D

(Points Eighteen through Twenty, inclusive)

Alternative position that in any event there is a vacancy of 1855.3 acres included in the 4353.5 acre vacancy referred to in Group A above.

### GROUP E

(Points Twenty-One through Forty-Six, inclusive)

The error of the Court in excluding the judgment and record in Fagan v. Stoner and the testimony of surveyors Simpson and Baker based thereon.

## GROUP F

(Points Forty-Seven through Eighty-Six, inclusive)

The errors of the Court in excluding ancient surveyor and land owner testimony as contained in Fagan v. Stoner and Hunter v. McDonough and Simpson's and Baker's Testimony based thereon.

## GROUP G

(Points Eighty-Seven through Eighty-Eight, inclusive)

The errors of the Court in excluding the admissions of the principal defendant, C. K. McCan.

## GROUP H

(Points Eighty-Nine through One Hundred Two, inclusive)

The errors of the Court in excluding the ancient deeds, and recitations contained therein, which are in the defendants' chain of title and the testimony of the witness Baker based thereon.

## GROUP I

(Points One Hundred Three through One Hundred Seventeen, inclusive)

The errors of the Court in excluding the testimony of surveying and other witnesses in the case of Holiday v. Harvey and the testimony of Simpson based thereon.

## GROUP J

(Points One Hundred Eighteen through One Hundred Thirty-Three, inclusive)

The errors of the Court in refusing to allow appellant to show Surveyor Simpson's true position in this case.

Appellant's points one through twenty (Groups A–D) relate to the merits of the claimed vacancies. His points twenty-one through one hundred seventeen (Groups E–I) relate to alleged errors of the trial court in the exclusion of evidence. Points one hundred eighteen through one hundred thirty-three (Group J) relate to the alleged error of the trial court in refusing to allow appellant to show surveyor Simpson's true position in the case.

Appellees have replied to appellant's points by ten counterpoints. The specific contentions raised thereby will be considered in the course of the opinion. Appellees' stated position is "that all the evidence offered by appellant, whether admitted or not, and whether admissible or not, did not have any probative value for the purpose of establishing a vacancy, but that on the contrary the entire record shows as a matter of law that no vacancy exists at either location." Otherwise stated, it is appellees' position that as a matter of law no vacancy exists and if the trial court erred in excluding any evidence, the error is harmless.

In determining whether material fact issues were raised by the evidence on the trial, we must be governed by the principles of law applicable to an appeal from a directed verdict, which in this case was against appellant. On such appeal, the evidence in the record supporting appellant's position must be accepted as true and all conflicts and inconsistencies must be resolved in appellant's favor. We must disregard all evidence and the inferences therefrom favorable to appellees and interpret the evidence and all the reasonable inferences to be drawn therefrom most favorably to appellant. Hart v. Van Zandt, 399 S.W.2d 791 (Tex.Sup.Ct. 1965); Adams v. Slattery, 156 Tex. 433, 295 S.W. 2d 859, 865 (1956); Walter E. Heller & Company v. Allen, 412 S.W.2d 712, 716 (Tex.Civ.App., Corpus Christi, 1967, wr. ref. n. r. e.). The statements and discussion of the evidence in this opinion will be in accordance with those rules.

The briefs and the record reflects numerous variations in spelling of words and

names, many of which are in Spanish. To some extent these variations will appear in this opinion, largely in accordance with the spelling used by the respective parties.

### The "A" Vacancy

Appellant's Group "A" points relating to the alleged 4353.5 acre vacancy are as follows:

### Point One

The Court erred in sustaining Defendants' Motion for Instructed Verdict.

### Point Two

The Court erred in sustaining Defendants' Motion for Instructed Verdict insofar as the same relates to the 4,353.5 acre vacancy described in plaintiff's original petition.

### Point Three

The Court erred in sustaining Defendants' Motion for Instructed Verdict as to the vacancy of 4,353.5 acres as described in Plaintiff's Original Petition because, as a matter of law, and under the undisputed evidence the lower line of the McDonough Grant is correctly located on Plaintiff's Exhibit No. 1, the Gonzales Grant, the Rodriguez Grant, the Nira Grant, the Ramon Grant and the Fernet Grant are locatable only by calls for course and distance from the southerly or lower line of the McDonough Grant: the upper or northerly line of the Traviesa Grant is as shown on Plaintiff's Exhibit No. 1 and taking into consideration the upper or northerly line of the Traviesa Grant and taking the calls for course and distance down from the lower or southerly line of the McDonough Grant, there exists a vacancy of 4,353.5 acres, consisting of a distance of 3,482.64 varas from the southerly or lower line of the Vairin Grant to the northerly or upper line of the Traviesa Grant, which said tract is vacant, unappropriated public free school lands of the State of Texas and subject to Appellant's Strong's application in this cause.

### Point Four

The Court erred in sustaining Defendants' Motion for Instructed Verdict as to the vacancy of 4,353.5 acres as described in Plaintiff's Original Petition because under Plaintiff's evidence introduced in this cause the southerly or lower line of the McDonough Grant is correctly located on Plaintiff's Exhibit No. 1, the Gonzales Grant, the Rodriquez Grant, the Nira Grant, the Ramon Grant and the Fernet Grant are all locatable only by calls of course and distance from the southerly or lower line of the McDonough Grant; the upper or northerly line of the Traviesa Grant is as shown on Plaintiff's Exhibit No. 1 and taking into consideration the upper or northerly line of the Traviesa Grant, and taking the calls for course and distance down from the lower or southerly line of the McDonough Grant, there exists a vacancy of 4,353.5 acres, consisting of a distance of 3,482.64 varas from the southerly or lower line of the Vairin Grant to the northerly or upper line of the Traviesa Grant, which said tract is vacant, unappropriated public free school lands of the State of Texas and subject to Appellant's Strong's application in this cause.

### Point Five

The Court erred in holding as a matter of law that no vacancy existed between the lower line of the Vairin Grant and the upper line of the Traviesa Grant.

### Point Six

The Court erred in holding that under the evidence no issue was raised as to the existence of a vacancy between the lower line of the Vairin Grant and the upper line of the Traviesa Grant.

### Point Seven

The Court erred in holding as a matter of law that the "bounded" recitation in

the Vairin Grant controlled over the course and distance calls in the Vairin Grant and resulted in enlarging the Vairin Grant and all of its distance calls and acreage by more than twice the amount called for in the Grant.

In reply to appellant's Group "A" points (as well as to appellant's Group "D" points relating to appellant's alternate "A" vacancy) the appellees assert their counterpoint one, as follows:

"The lower or southeast line of the Jose Vairin grant is a common line with the upper or northwest line of the Maria Josefa Travieso grant so as to preclude the existence of a vacancy between such lines as a matter of law."

It is appellant's basic position that the "A" vacancy of 4,353.5 acres arises under the following facts. Commencing at the confluence of the San Antonio and Guadalupe Rivers, there is the grant to Jóse Maria Valdez and son Andalecio Valdez, dated October 8, 1834. The next grant was to Maria Josepha Traviesa also dated October 8, 1834 immediately adjoining the Jose Maria Valdez Grant up the Guadalupe River. The Traviesa Grant was "composed of 4430 Mexican varas on the Guadalupe River on its right margin beginning where the lands of Don Jose Maria Valdez terminate". No artificial or natural monuments are called for except the Guadalupe River. The description in the original grant of the Traviesa does not close, and there appears to be at least one missing call and other possible errors. Appellant says that at one time there was uncertainty and divergent ideas as to the location of the upper Jose Maria Valdez line; and since the location of the lower Traviesa line was the same as the upper Jose Maria Valdez line, a consequent uncertainty existed as to the lower Traviesa line; and since the upper Traviesa line was 4,430 varas distance from the lower Traviesa line, some uncertainty existed as to the location of the upper Traviesa line. All of these lines were locatable only by course and distance

without the aid of any natural or artificial monuments, except in the case of Jose Maria Valdez Grant which spanned the confluence of the Guadalupe River and the San Antonio River, and except that both grants are bounded by the Guadalupe River. In the Jose Maria Valdez Grant there are no calls for distance on the Guadalupe or San Antonio Rivers. Appellant contends that under all the evidence, as introduced, any uncertainty as to the location of the upper line of the Jose Maria Valdez and the lower and upper lines of the Traviesa have been resolved and their locations are as shown on the appellant's Exhibit 1.

The next grants in point of time were made further up the Guadalupe River. Appellant particularly points to the McDonough Grant of October 15, 1834. In the application of McDonough he prays for a grant of a league of land "on the Guadalupe River and Coletto Creek". The grant to McDonough is of 2,000 Mexican varas on the Guadalupe River and Coletto Creek where they join "with a depth on the upper part of 12,050 varas, and on the lower part of 12,910 varas and being bounded on the northeast by the river, on the northwest by vacant lands, on the southwest by the same" and "on the southeast by the lands of Citizen Juan Gonzales". Appellant says that the upper and lower lines of the McDonough league were well located on the ground by McDonough, the grantee, by the early settlers, by the early surveyors, by the decision of the Supreme Court of Texas in Fagan v. Stoner, 67 Tex. 286, 3 S.W. 44 (1887), and by uniform recognition and acquiescence from practically the date of the grant down to and including the present time.

The next grant coming down the Guadalupe River is the Juan Gonzales Grant which was also dated October 15, 1834 and is for "2,000 varas frontage on the Guadalupe River on its right margin and is bounded on the northwest by the McDonough, on the southwest by vacant lands, on the southeast by the lands of Citizen Leonardo

Rodriquez." No natural or artificial objects or monuments were called for in the Gonzales Grant except the Guadalupe River and it is located and has always been located by taking the calls for distance down the river 2,000 varas from the lower line of the McDonough League.

The next grant, also dated October 15, 1834, is a grant of two leagues to Leonardo Rodriquez and Deciderio Nira (contained in one instrument) and which calls for 2,000 varas frontage on the Guadalupe River for each league, making a total of 4,000 varas, with the two leagues being bounded on the northwest by the Gonzales League and on the southeast by vacant land. The only way to locate these two leagues is by call distances down the river from the lower line of the Gonzales League.

Still coming down the Guadalupe River, the next grant is the Francisco Ramon, dated October 20, 1834. This grant is for 2,500 Mexican varas frontage on the Guadalupe River and is bounded on the northwest by the Nira league and "on the southeast by Citizen Fernet." Again, there are no artificial or natural monuments to locate this grant other than by call distances from the lower line of the Nira Grant.

The next grants (in one instrument) are those to August L. Fernet and Jose Vairin, on October 29, 1834. The Fernet grant was for 3,000 Mexican varas frontage on the Guadalupe River and calls to be "bounded on the northwest by lands of Francisco Ramon" and "on the southeast by the Vairin league."

Appellant says that accepting the Supreme Court's decision in Fagan v. Stoner, supra, as properly locating the lines of the McDonough Grant, and considering the fact that all the grants south of the McDonough are locatable only by calls for course and distance, the upper and lower lines of the Fernet Grant would be shown as on appellant's Exhibit 1. Also, taking all the testimony, all surveys (including all surveys by the defendants here), the maps,

the continued acquiescence, and the continued recognition of the lines of the various grants, each and every one show the upper and lower lines of the Fernet Grant in the same location as shown on appellant's Exhibit 1.

The Vairin Grant calls for "2,750 Mexican varas frontage on the Guadalupe River" and calls to be bounded "on the northwest by lands of the aforesaid Fernet" and, *appellant says by mistake,* also calls to be bounded "on the southeast by the lands of Dona Josepha Traviesa." Appellant contends that a mistake was made in calling for the Vairin Grant to be "bounded" by the Traviesa because again, there was no way to locate the Vairin except by course and distance calls from the lower line of the Fernet and applying the call of distance of 2,750 Mexican varas frontage on the Guadalupe River, and placing the lower line of the Vairin 2,750 varas from its upper line (or the lower line of the Fernet) there is a vacancy of 3,482.64 varas between the lower line of the Vairin and the upper line of the Traviesa; and that to enlarge the Vairin to go down to the upper Traviesa line would cause the call in the Vairin league of 2,750 varas frontage on the river to be enlarged to 6,232.6 varas—an excess of 3,482.6 varas.

Stating the circumstances another way, appellant says that the Traviesa grant by its calls begins at the upper boundary line of the Jose Maria Valdez Grant, and extends up the Guadalupe River a frontage distance of 4430 varas, and the Vairin Grant by its calls begins at the lower line of the Fernet league and extends down the river a frontage distance of 2750 varas. Appellant says that the lower Fernet line (and the upper Vairin line) is clearly and indisputably located. By honoring these calls, the Vairin at its lower line fails by 3482.6 varas to reach the upper line of the Traviesa. In order to get to the upper line of the Traviesa the call of 2750 varas frontage on the Guadalupe River as set forth in the Vairin Grant must be enlarged to 6,232.64 varas, or considerably more than

twice the 2,750 vara call. Additionally, the Vairin Grant calls for its back lines (away from the river) to be closed "west a line of 3,000 varas running from east to west and another north to south with 760", and if the Vairin is expanded to include all the land down to the upper line of the Traviesa, the 3,000 vara east to west back line call would have to be extended to 6,417.18 varas and the 760 vara north to south back line call would have to be extended to 2,115.82 varas. Also, the Vairin Grant instead of covering one league of land of 4,428 acres as called for would be enlarged to 9,711 acres.

I here insert plat No. 3, which is based upon plaintiff's Exhibit 235, showing the Vairin as called for in the original grant outlined in wide and heavier shaded lines, and the alleged "A" vacancy area immediately below it indicated by diagonal lines within it and by narrower and lighter shaded outside lines.

Plat No. 3

It is apparent from plat No. 3 that the call in the Vairin for its lower line to be "bounded" by the Traviesa (if the lower line of the Vairin is located as contended for by appellant) cannot be satisfied without doing violence to the distance calls of the Vairin and distorting its configuration and allowing the quantity of it to be increased over 200%.

Basically, it is appellant's position that the call in the Vairin Grant for it to be "bounded" on the southeast by the Traviesa is a mistake and will not control over the course and distance calls because:

(1) To enlarge the Vairin to go down to the upper Traviesa line would cause the call in the Vairin league of 2,750 varas frontage on the river to be enlarged to 6,232.6 varas—an excess of 3,482.6 varas.

(2) To enlarge the Vairin to go down to the Traviesa would increase the acreage in the Vairin league from a league of 4428.4 acres (as called for in the grant) to a toal of 9711 acres, or an excess of 5342.6 acres. (The acreages mentioned aggregate 9771 acres)

(3) If the call of the Vairin Grant for 2750 varas on the Guadalupe is increased to 6232.6 varas (or 226.6% of the distance called for) it would be impossible to close the back calls of the Vairin unless the east-west call of 3000 varas is extended to 6417.-18 varas and the north-south call of 760 varas is extended to 2115.82 varas—in each instance, about 2¼ times the distance called for.

(4) The only way to determine the proper location of the unmarked upper line of the Traviesa Grant is by a course and distance call on an unmarked prairie from the unmarked upper line of the Jose Maria Valdez Grant. Appellant contends that although the upper line of the Jose Maria Valdez is properly located on his Exhibit 1, at times uncertainty has existed as to the proper location of this line, with a consequent uncertainty as to the lower and upper lines of the Traviesa and the call to be

bounded by an uncertain and unmarked line, such as the upper line of the Traviesa, cannot have the effect of more than doubling the course and distance calls of the Vairin Grant.

(5) There are no monuments or objects, natural or artificial, in the various descriptions by which the lower line of the Vairin, the upper line of the Jose Maria Valdez and the upper and lower lines of the Traviesa can be located. All of these lines are locatable only by course and distance calls on open, unmarked prairie.

(6) The Traviesa Grant does not call for joinder with the Vairin Grant, but on the contrary states that it is bounded "on the northeast by lands of Citizen _____."

The above constitutes a summary of appellant's position with respect to the basic "A" vacancy of 4,353.5 acres.

Appellant's statement and summary of the evidence under his points one through seven, relating to the basic "A" vacancy, covers one hundred thirty-two printed pages of his brief. In general, appellant's statement concerns the following: (1) The Mexican grants by the State of Coahuila and Texas and, particularly, the location of the upper line of the Traviesa. (2) The lower line of the McDonough league, particularly as involved in Fagan v. Stoner, 67 Tex. 286, 3 S.W. 44 (1887), which case appellant says, in addition to independent evidence, establishes that line and consequently by calls for course and distance the lower line of the Fernet and upper line of the Vairin. (3) Fagan v. Stoner, supra, as being in the chain of title of all defendants-appellees. (4) The ancient documents which establish the lower line of the Fernet and upper line of the Vairin. (5) The old maps which support appellant's position as to the location of the McDonough and the lines South to the lower line of the Fernet and upper line of the Vairin. (6) The agreement of old time surveyors with appellant's position as to locations of the various grants involved. (7) The agree-

ment of recent surveyors with appellant's position as to such locations. (8) The testimony of surveyors Simpson and Baker, given on the trial of this case, supporting appellant's position as to locations. (9) The location of the lower line of the McDonough and lines of the various grants down to and including the upper line of the Vairin as being well established in the community by reputation, recognition and the declarations of former and present owners and other parties in a position to know about them. (10) That the defendants-appellees have at all times known of the vacancy between the lower line of the Vairin and upper line of the Traviesa.

I am of the opinion that the evidence admitted by the trial court was legally sufficient to support appellant's position as to the location of the lower line of the McDonough and the lines of the various grants (The Gonzales, Rodriquez, Nira, Ramon, Fernet) down to and including the upper line of the Vairin.

I am also of the opinion that the evidence admitted by the trial court was legally sufficient to support appellant's position as to the location of the upper or northwest line of the Traviesa as asserted in connection with his basic "A" vacancy. However, it must be kept in mind that appellant has an alternative position as to the location of the upper Traviesa line which would put it further up the Guadalupe River, and would give rise, under appellant's Group "D" points, to a smaller vacancy of 1855.3 acres instead of 4353.5 acres under the basic "A" vacancy. The Group "D" points will be discussed after I have considered appellant's points grouped as "A", "B", and "C". I will hereafter consider some of the evidence excluded by the trial court which involves Fagan v. Stoner, supra, as well as other matters.

### The Applicable Mexican Law

All of the grants directly relating to the "A" vacancy were made under the Coloni-

zation Law of 1825, titled as Decree No. 16, dated March 24, 1825, of the State of Coahuila and Texas, 1 Gammel's Laws 125. A proper decision of this case requires consideration of the relevant provisions of that law, which are quoted below:

"Article 1. All foreigners who in virtue of the general law of the 18th of August, 1824, which guarantees the security of their persons and property in the Republic, shall wish to emigrate to any of the settlements in the State of Coahuila and Texas, are permitted to do so; and the said State invites and calls them."

"Art. 10. * * * (Beginning with its last sentence). The quantity, whereby the lands are to be distributed, shall be designated in the following articles:"

"Art. 11. A square of land measuring one league, consisting of five thousand varas on each side, or what is the same thing, a superfices containing twenty-five million varas, shall be called a sitio, and this shall be the unit for enumerating one, two or more sitios, in the same manner as one million square varas, or one thousand varas on each side, which shall constitute a labor, shall be the unit for counting one, two, or more labores. The vara for this measure shall consist of three geometrical feet."

"Art. 14. One labor shall be granted to each family included in the contract, whose only occupation is the cultivation of the soil; and should the same also raise stock, grazing land shall be added to complete a sitio; and should the raising of stock be the exclusive occupation, the family shall receive a superficies of twenty-four million square varas, (being a sitio lacking one labor.)"

"Art. 15. Unmarried men shall receive the same quantity on marrying, and foreigners, who marry natives of the country, shall receive one-fourth more; those who are entirely single, or who do not compose a part of any family, contenting themselves rather with the

fourth part of the quantity aforesaid, which shall be computed to them on the assignment of their land."

"Art. 16. Families and single men who, having emigrated separately and at their own expense, shall wish to annex themselves to any of the new settlements, can do so at all times, and the same quantity of land shall be respectively assigned them, as specified in the two foregoing articles; but should they do so within the first six years from the establishment of the settlement, one labor more shall be granted to families; and single men, instead of one-fourth, as specified in article 15, shall receive one-third."

"Art. 26. It shall be understood that the new settlers who shall not, within six years from the date of their possession, have cultivated or occupied, agreeably to their class, the lands that shall be granted them, have renounced the same; and the respective political authority shall immediately proceed to take back from them the land and titles."

"Art. 27. * * * The other settlers shall be authorized to alienate their land, when they shall have completed the cultivation thereof, and not before."

"Art. 30. New settlers, who shall resolve to leave the State, to establish themselves in a foreign country, shall be at liberty to do so with all their property, but after thus leaving, they shall no longer hold their land; and should they not have previously disposed of the same, or should not the alienation be in conformity to art. 27, it shall become entirely vacant."

For the purpose of carrying out the provisions of this law instructions were issued by the Executive Department of the State to the Commissioners defining their duties and the duties of the surveyors, whom they should appoint. Among these were the following pertinent provisions, Vol. 1, Pages 180–183, Gammel's Laws of Texas.

"Executive Department of the State of Coahuila and Texas

"Secretary's Office of the Congress ot Coahuila and Texas. Instructions to which the commissioner for the distribution of lands to the new colonists who present themselves to settle in the State, according to the colonization law of March 24th, 1825, shall conform:

    *    *    *    *    *    *

"Art. 4. He shall issue the land titles in the name of the State, in conformity to the law, giving the new settlers possession of the same in legal form, and previously citing the adjoining proprietors, should there be any.

"Art. 6. He shall adopt the necessary measure that no vacant lands be left between possessions, and in order that the limits of each one may be known at first sight, he shall oblige the colonists to set land marks upon their lands within one year, with fixed and permanent boundaries.

"Art. 7. He shall appoint, under his own responsibility, the surveyor, who shall run off the lands scientifically, previously requiring him to take the oath in form well and faithfully to execute the duties of his office.

"Art. 24. He shall take special care that the portions of land granted the colonists by articles 14, 15 and 16, be measured by the surveyors with the greatest accuracy, without permitting any one to take more land than what is pointed out by the law, and in the contrary event he shall be personally responsible.

"Art. 28. The commissioner shall be personally responsible for all acts and provisions by him effected or performed in violation of the colonization law and these instructions."

The colonization law further provided for contracts by the government with Empresarios who were authorized to bring in and settle qualified colonists and to approve their applications for lands to be granted to them under the law by the com-

missioner. Acting under this law, within a relatively few weeks in the fall of 1834, mostly in September and October, the commissioner, Jose Vidaurri, granted a large number of titles to settlers in the Powers and Hewitson Colony under application by the settlers approved by the Empresarios. These grants covered thousands of acres between the Guadalupe and San Antonio Rivers and west of the San Antonio River extending northward from their junction some twenty odd miles in rough terrain intersected by bayous, lagoons and creeks. Appellant says in substance that no evidence indicates and it is not reasonable to believe that any of the tracts fronting on the Guadalupe River were actually surveyed on the ground individually at the time of the 1834 grants, as there were no actual field notes as such with marked lines, bearing trees or monuments; but instead, that the tracts were described in the grants by frontage distances on the river, lengths of lines extending from the river and called distances between the ends of the lines opposite from the river to close the figure·on the back side and embrace the desired acreage.

### The Vairin Grant

The definite limitation of the land to be granted was recognized by Fernet when in the application for himself and Vairin he stated:

"* * * *taking advantage of Article 16 of the Law* of March 24, 1825, has the honor of stating to Your Excellency that they both wish to settle with their families as colonists in Senor Power's Colony; and for that reason they *beg that you kindly concede to them the amount of land as provided in articles 11 and 16 of said law, * * *"* (emphasis supplied)

Articles 11 and 16 of the Law of March 24, 1825, as set out above, limit the grants to one league each for Fernet and Vairin. The terms of the grant show that Fernet, acting for himself and as agent for Vair-

in, acknowledged that "he understood that he must comply faithfully with the Law of March 24, 1825." The actual description in the one league grant to Vairin is as follows:

"The one designated as No. 3, belonging to Vairin, 2,750 Mexican varas frontage on the Guadalupe River, and depth along the upper part 10,780 varas, and along the lower 8,790 varas, closing the figure with a line of 3,000 varas, running from east to west, and another north to south with 760. It is bounded on the northwest by lands of the aforesaid Fernet, on the southwest by lands occupied by the Senor Priest Valdes, on the southeast by the league of Dona Josefa Travieso, and on the east by the aforementioned river."

Appellant says that the actual wording of the Vairin Grant does not amount to a true joinder call to the Traviesa. Appellant concedes that he has found no authoritative decision on this precise wording and its effect, and for the purpose of his argument states that even if the word "bounded" is considered as a joinder call, it is not controlling here. Appellant insists that the wording itself is something much less than a true joinder call and must be considered in connection with all other facts in ascertaining the true construction of the Vairin Grant.

### The Testimony of the Surveyors Simpson and Baker

Mr. Byron L. Simpson was appointed by the Commissioner of the General Land Office as surveyor on the mineral applications filed by appellant. Simpson testified by way of deposition in this case. He declined to testify in person on the trial, and the evidence in this connection will be considered under appellant's Group J points (118–133).

Simpson testified in part as follows: He was a licensed State Land Surveyor, a registered Professional Surveyor, and a registered Public Surveyor and Engineer.

He made a survey in connection with appellant's applications and filed a report of same with the Land Commissioner. He met with the interested parties and obtained copies of a plat and report made by surveyor F. J. Hardy in 1923 for the McFaddin Estate and Ranch. He also made preliminary investigation of the archives of the General Land Office, County Surveyor's Records, Deed Records, District Court Records, along with other records and accumulated a voluminous amount of information. Simpson's testimony, including his survey on the ground, generally supported appellant's position concerning the alleged vacancies and locations of lines of the various Mexican grants in the area. The concluding portion of his report reads as follows:

"I have prepared three maps identified as Exhibit A, B and C showing different constructions for the Mexican Grants in this area. The position of the Junior surveys along the San Antonio River remain the same on each exhibit.

Exhibit 'A' locates the position of the Gonzales, Rodriguez, Nira, Ramon, Fernet and Vairin Grants call distance from South line of the McDonough League. The Jose Maria Valdes Grant and the Traviesa Grant are shown as previously described in this report. Under this construction the South line of the Vairin Grant fails to reach the North line of the Traviesa Grant by 3482.64 varas. I have prepared field notes covering this area of 4353.5 acres. This entire area is within the enclosure of C. K. McCan et al and the nearest production of oil or gas is on this tract.

Exhibit 'B' locates the position of the Gonzales, Rodriguez, Nira, Ramon, Fernet and Vairin Grants call distance from the South line of the McDonough League. The back lines of the Fernet Grant are reversed from that shown on Exhibit 'A'. This is in conformity with Fernet Grant as delineated on the map found in Atlas A page 1. The Traviesa

Grant is located around the Cameron Surveys as previously described on page 7 of this report. Under this construction 1855.3 acres, tract 1 M.A. 56233, would remain between the South line of the Vairin Grant and the North line of the Traviesa Grant. Tract 2 M.A. 56233, contains 199.1 acres between the back liens of the Fernet Grant and the East lines of the Presidio Irrigation Co. Surveys 1 and 2. M.A. 56234 contains 3079.4 acres and is that portion of the John Cameron Surveys not in conflict with the Junior surveys to the South. Field notes have been prepared and returned herewith for the three tracts mentioned above. Tract 1 M.A. 56233 and M.A. 56234 lie within the enclosure of C. K. McCan et al and there is production of oil or gas on each tract. Tract 2 M.A. 56233 lies within the enclosure of Thomas O'Conner et al and the nearest production of oil or gas is about one mile East of this tract. Under this construction approximately 3450 acres would remain in the Traviesa Grant which calls for one league of land, or 4428 acres.

Exhibit 'C' shows the position of the Gonzales, Rodriguez, Nira, Ramon, Fernet and Vairin Grants when the 3482.64 varas between the South line of the Vairin Grant and the North line of the Traviesa Grant as shown on Exhibit 'A' is prorated among the six Grants. In the original titles I find adjoiner calls as follows: The Gonzales Grant calls for the McDonough Grant on the Northwest and the Rodriguez Grant on the Southeast. The Rodriguez Grant and the Nira Grant are found in the same title with the Rodriguez Grant calling for the Gonzales Grant on the Northwest and the Nira Grant calling for vacant land on the Southeast. The Ramon Grant calls for the Nira Grant on the Northwest and the Fernet Grant on the Southeast. The Fernet Grant and the Vairin Grant are found in the same title with the Fernet Grant calling for the Ramon Grant on the Northwest and the Vairin

Grant calling for the Traviesa Grant on the Southeast.

In relocating the Junior Surveys along the San Antonio River I found what I take to be the original Northwest corner of the C. L. Mann Survey and also the original re-entrant corner of the Mary E. Kay Survey. I adopted the corners set by Mr. F. J. Hardy for the C. L. Mann Survey and the James Wilson Survey as they conform to the creek calls found in the original field notes. I also relocated the East line of the C. O. Edwards Survey in the same position as Mr. Hardy.

My map clearly shows the construction of the Junior Surveys and as only minor discrepancies were found I will not go into detail. At the hearing to be held in Austin pertaining to mineral applications 56233 and 56234 I will explain what I have found in greater detail at the request of any interested party."

Simpson's deposition testimony was generally in accord with his report, but he supplied many additional details of the survey and investigation made in the instant case, covering several hundred pages of the Statement of Facts.

Mr. John H. Baker testified in person as a witness for appellant in part as follows: He was a registered Public Surveyor and a licensed State Land Surveyor, having become a registered Public Surveyor in 1935 and a licensed State Land Surveyor in 1934. He has been surveying about 49 years and resides in Fort Worth. His primary surveying work has been on ranches and on oil field surveys. He first worked in Victoria County when the Bloomington Field came in in the late 1940's, and thereafter, about three years before the trial, worked southeast of Victoria. He has been a member of the Board of Examiners for Licensed State Land Surveyors since 1950. He took Simpson's Map A and Simpson's Map B and combined them into plaintiff's Exhibit No. 1. He further stated that he put the lower line of the McDonough League on plaintiff's Exhibit 1 as it was located on both Simpson's A and B maps. He took Map A by Simpson and added the back lines of the two Cameron Leagues (hereafter to be more fully discussed) as shown on Map B, to make plaintiff's Exhibit No. 1. The lower line of the McDonough League and the upper and lower lines of the Gonzales, Rodriguez, Nira, Ramon and Fernet Grants are the same on plaintiff's Exhibit 1 as on Simpson's Maps A and B. He also placed on plaintiff's Exhibit 1 the upper and lower lines of the Vairin and the upper line of the Traviesa as shown on Simpson Map A. He then testified as to an accurate surveyor's description of the 4353.5 acre "A" vacancy. He then gave the field notes of the 460.45 acre tract (the "C" vacancy), which is included in the 4353.5 acre "A" vacancy and also in the unpatented portion of the Cameron League 3079.4 acre vacancy, leaving the unpatented portion of the Cameron two leagues which are not included in the 4353.5 vacancy to be 2618.34 acres (the "B" vacancy).

Mr. Baker then testified that he had prepared plaintiff's Exhibit 231 which is a film reproduction of plaintiff's Exhibit 1 and on the same scale; and also had prepared various plats and maps which were in evidence to the same scale as appellant's Exhibit 1 (map) and Exhibit 231 (the film overlay), and then compared them visually with the film overlay. The results of such comparison and Mr. Baker's testimony in connection therewith will be hereafter considered.

Some of the evidence relied upon by appellant in support of his position as to the "A" vacancy involves the testimony of defendant-appellee C. K. McCan, a report and plat made for the owners of the McFaddin Ranch in 1923 by surveyor F. J. Hardy, and more recent surveys and plats made by the defendant oil companies. This evidence is in part as follows:

Mr. McCan testified that James A. McFaddin had three surviving children, Mrs.

W. H. Crain, Al McFaddin and Mrs. Nave. Mr. C. K. McCan is the son of Mrs. Nave. In 1924, Mr. McCan, along with Mr. W. H. Crain took over the joint management of the McFaddin Ranch and since that time has been manager or co-manager of the McFaddin Estate affairs. He has lived on the McFaddin Ranch since that time. In 1923 Mr. Al McFaddin was manager of the McFaddin Estate and Ranch affairs, and employed Mr. F. J. Hardy to make a survey of the Ranch. There has been no subsequent survey of the entire ranch made for the McFaddin Estate but several oil company surveys have been made since then. Mr. McCan testified that the McFaddin interests have always regarded the Hardy survey as accurate and in so saying testified:

"QUESTION: Have you always regarded the Hardy survey and plat as being accurate, so far as you know?

ANSWER: Yes, sir.

QUESTION: And have you always recognized it as being an accurate and correct survey as reflected by the plat, the Hardy plat?

ANSWER: Yes, sir, we have.

QUESTION: And I believe you have acted on it, followed it and recognized it as an accurate plat, have you not?

ANSWER: Yes, sir.

QUESTION: Actually, if you know this —you may not know this, but if you do on the various leases made to your various leases, do you know how they went about surveying the land, or specifically, did they use the Hardy plat as a basis and take off from there?

ANSWER: Yes, sir. I would say 'yes'. The answer will be 'Yes'.

QUESTION: You know of no overall survey of the oil companies or anybody else with respect to the land, except the Hardy 1923 Survey?

ANSWER: No, sir. You mean the whole thing?

QUESTION: Yes, sir.

ANSWER: The surveys were in detail and accurate meanders of the river, and so forth, but they were in connection with an oil lease."

Mr. McCan further testified that defendants Mobil, Sunray DX, Monsanto (predecessor of Humble) and Shell each made surveys of the land. He testified that it is his understanding that all of the oil company maps were probably based upon the Hardy 1923 survey; that the Shell Map was the result of an actual survey on the ground; that United Gas made a survey (plaintiff's Exhibit 180); that Sunray DX made a plat in the 1940's as the result of an actual survey on the ground (plaintiff's Exhibit 181); that the maps referred to are all the basis for the oil companies' operations and each one is consistent with the Hardy 1923 plat; that there had never been any complaint by anyone as to any inaccuracy in the Hardy 1923 plat. Mr. McCan further testified that he took the Hardy 1923 map as completely accurate and in so saying said:

"QUESTION: Now, I notice with respect to the Hardy map that there is shown on there the Fielding Jones Survey. Is that your position that the Fielding Jones is properly located by Mr. Hardy on the 1923 map?

ANSWER: Well, we take the map as—

QUESTION: As accurate?

ANSWER: Yes.

QUESTION: The same with respect to the BB&C Survey?

ANSWER: Yes.

QUESTION: And the same with respect to what I call the middle McFaddin, between the Fielding Jones and the BBB&C, and also with respect to the M. D. Hoyd?

ANSWER: We take the whole thing.

QUESTION: That is, the whole map as shown by Hardy?

ANSWER: Yes, sir. All subsequent business is based on that."

Mr. McCan further testified that Mr. Crain, then managing partner of the Mc-Faddin interest, went along with Mr. Hardy on the survey.

I will next consider the 1923 Hardy plat and report. The plat is plaintiff's Exhibit 35 and the report is plaintiff's Exhibit 143. With respect to the location of the grants on the Guadalupe River, the Hardy report establishes the upper line of the Traviesa at the same location as shown on appellant's Exhibit 1, and establishes the location of the upper and lower lines of the Nira league, the upper and lower lines of the Ramon league, the upper and lower lines of the Fernet league all as shown on appellant's Exhibit 1. The principal material difference between appellant's Exhibit 1 and the Hardy plat is that Mr. Hardy in his 1923 survey (while locating the Nira, Ramon and Fernet lines and the upper line of the Vairin as does appellant), enlarged the distance call in the Vairin Grant from 2750 varas to 6161 varas in order to reach the upper line of the Traviesa. Insofar as is material to this phase of the case the Hardy 1923 report reads as follows:

"I then went to what is the recognized upper line of the lower quarter of the Desiderio Nira league and ran a line S. 34 E., 500 varas to the north line of the Francisco Ramon league; then 2500 varas the called distance across the Ramon to the line of the Fernet and Ramon; then 3000 varas for distance across the Fernet league to the upper line of the Jules Vairin league; a total distance of 6000 varas. The flagged N. 56E to the Guadalupe River, at a point where the river ran almost at right angles with the line about 75 varas up and quite a ways below. Then measured S. 56 W. 10,780 varas or 22,944.4 ft., the called distance in the upper line of the Vairin and lower line of the Fernet leagues, a stake in Mrs. O'Connor's pasture. Thence S. 79E. at 7061.5 ft. intersect west fence of the McFaddin lands, 1742 ft. S. 15 W. of the old rock in north line of the B. B. B. & C. Railroad Company survey previously mentioned in this report; at 10,074 across east line of said survey; at 10,-347.5 ft. a cross line between the J. A. McFaddin and Fielding Jones prairie survey; at 17,189.5 ft. a stake for corner of Vairin. Thence S. 11 W. at 1961 ft. a cross south line of the Fielding Jones and north line of the Hoyd surveys and at 7046 ft. the south corner of the Vairin league as previously established, making the frontage on the river of the Vairin league 17,115 ft. or 6161 varas. The field notes call for a line east to west of 3000 varas and another north, south of 760 varas, to close, so I extended the east to west line 3188.2 varas or 6188.2 varas and north south line 1776.5 varas or 2536.5 varas in all in order to close the survey."

With respect to the location of the upper line of the Traviesa, Mr. Hardy's report shows the following:

"I began at the northwest corner of C. L. Mann survey, shown me by Mr. Crain as the only corner known where original bearings are still standing, the double Live Oak, being still standing and marks plainly visible.

I then ran S. 75 E. 3335.4 ft. set corner for the C. O. Edwards 1280 acre survey, and at 5280 ft. set northeast corner of said Mann survey. Then went back to stake set for west corner of the Edwards survey and ran N. 85 34 E. 6785 ft. and set pipe in field for Edwards north corner and corner of the Traviesa league.

Then ran S. 15 W. 2166.6 ft. set iron pipe for common corner of Traviesa and Valdez leagues. Then continued S. 15

W. at 410 ft. found an old Black Jack, marked fore and aft, and found many other trees marked from there to Kay Creek, but they were not in my opinion the original Valdez league line marks, but took them to be marks made by Mr. W. H. Allen when he made the Edwards survey in 1881, or by E. A. Hansoldt when he made the I. & G. N. Railroad Company surveys in 1874 (afterwards lifted) continued line from northwest corner of Valdez, at 3900 ft. Kay Creek, crossing same into weed prairie, at 10,-466.8 ft., Elm Bayou, put in a two inch iron pipe, from which an Elm, 10 inches in diameter, marked X bears N. 20 E. 42 ft. at 11,000.8 southeast corner of the C. O. Edwards survey and at 16,216.8 ft. (5838 varas), the San Antonio River, making west line of Valdez 38 varas long. At this point I found a large pecan, marked Y, bearing N. 75 W. 16 ft. Could find no field notes calling for such a tree, but marks were very old."

After stating that he had run from the upper line of the J. M. Valdez 4430 varas (the call distance across the Traviesa) to locate the upper line of the Traviesa, his report continues:

"When this line was being flagged to the river, Mr. Dave Phelps and Mr. W. H. Crain went ahead and Mr. Phelps located a ditch which he states, had washed out along a fence between lands owned, in 1875, by _____ in the Traviesa league and J. D. Miller in the Vairin league, and my line ran exactly along the ditch.

I believe this to be the point on said river, where the Traviesa and Vairin corner and put in a galvanized two inch pipe, from which the mouth of old river on east side of the Guadalupe river bears S. 73½ E. 265 ft. (triangulated).

Then ran S. 56 W. between the Vairin and Traviesa Leagues, at 234 ft., a stake in levee from which an Elm, 10 inches in diameter marked X bears S. 75 20 W. 102 ft.; at 3311 ft. old ditch; at 4311 ft; head of ditch; at 6264 ft. misquite stake set here; at 8977 ft. sand lake; at 10,140 ft. across lake; at 16,-666 ft. Dry Kay Creek, at 19,066 ft., Main Kay Creek; at 22866/6 ft., intersect east line of Hoyd survey, at 24,317 ft. or 8790 varas, set a two inch galvanized iron pipe for south corner of the Jules Vairin League."

By reference to the Hardy Plat it will be seen that the upper line of the Traviesa is where appellant's Exhibit 1 locates it.

The Hardy report and plat strongly support appellant's contentions on the "A" vacancy. The Hardy report states that he "then went to the recognized upper line of the lower quarter of the Desiderio Nira League (where appellant's Exhibit 1 puts it) and ran a line S. 34 E. 500 varas to the north line of the Francisco Ramon (as shown on appellant's Exhibit 1); then 2500 varas the called distance across the Ramon to the line of the Fernet and the Ramon (as shown on appellant's Exhibit 1); then 3000 varas for distance across the Fernet league to the upper line of Jules Vairin league (as shown on appellant's Exhibit 1) a total distance of 6000 varas" which is the exact distance from the upper line of the lower quarter of the Nira to the upper line of the Vairin and is exactly the called distances across the surveys. Mr. Hardy ran the upper line of the Vairin and the lower line of the Fernet as appellant has done. However, in order to reach the upper line of the Traviesa (referred to in the Hardy Report as the south corner of the Vairin league), Mr. Hardy had to increase the Vairin frontage on the Guadalupe River from a call of 2750 varas to 6161 varas. The Hardy report recognizes this when it says:

"* * * making the frontage on the river of the Vairin league 17,115 feet or 6161 varas."

This enlargement of the Guadalupe River frontage call of the Vairin from 2750 varas to 6161 varas, also resulted in a large increase in the back line calls

of it. The 3000 varas back line call of the Vairin from east to west was enlarged to 6138.2 varas and the 760 vara back line call of north-south was enlarged to 2536.5 varas. In so doing the Hardy report states:

"* * * making the frontage on the river of the Vairin league 17,115 ft. or 6161 varas. The field notes call for a line east to west of 3000 varas and another north, south of 760 varas, to close, so I extended the east to west line 3188.2 varas or 6188.2 varas and north south line 1776.5 varas or 2536.5 varas in all in order to close the survey."

Mr. Hardy's plat carries this enlargement of the Vairin in the same way as his report.

Appellant says that Hardy did the only possible thing to attempt to cover the "A" vacancy; that he simply extended the Vairin call distance of 2750 varas frontage on the river to 6161 varas to take in the vacancy and extended the back line calls in the Vairin of 3000 varas to 6138.2 varas and the back line call of 760 varas to 2536.5 varas in order to take in the vacancy in the Vairin league or as put by him "in order to close the survey."

The expanded construction of the Vairin as shown by the Hardy report and plat is the one that has been consistently adopted by the defendant oil companies. Here appellant points to Pl. Exs. 175 to 178 and 181 (all being Sunray DX Maps), Plaintiff Exhibits 156 to 158 (Mobil Maps) and Plaintiff Exhibits 159, 160, 163 to 166, 168 to 171 (Shell Maps).

In order to emphasize the consistency of all of these maps, as supporting appellant's position, his counsel requested Surveyor John Baker to make a transparent overlay or film reproduction of appellant's Exhibit 1, as above-mentioned. Mr. Baker did this in plaintiff's Exhibit 231. He prepared the 1923 Hardy plat (Plaintiff's Exhibit 35) to the scale of appellant's Exhibit 1 (Plaintiff's Exhibit 232). He prepared a Sunray

DX map (Plaintiff's Exhibit 181) to the scale of appellant's Exhibit 1 (Plaintiff's Exhibit 233). He prepared a Mobil map (Plaintiff's Exhibit 156) to the scale of appellant's Exhibit 1 (Plaintiff's Exhibit 234), and he prepared a Shell map (Plaintiff's Exhibit 243) to the same scale as appellant's Exhibit 1 (Plaintiff's Exhibit 243).

Mr. Baker took the 1923 Hardy plat (Plaintiff's Exhibit 35) and putting it on the same scale as Plaintiff's Exhibit 1 reproduced that plat. The Hardy map, to the same scale as Plaintiff's Exhibit 1, is Plaintiff's Exhibit 232. He then took and marked the upper and lower lines of the Traviesa and the upper and lower lines of the other leagues and by comparison with appellant's Exhibit 1 (Simpson's Map A) stated that he took the lower line of the Traviesa as shown on the overlay and on the Hardy's map to scale and match the upper line of the Traviesa. After matching the upper line of the Traviesa as shown on both plats, he then testified that the overlay (Plaintiff's Exhibit 1) when compared with the Hardy map showed substantial agreement except as to the width of the Vairin which on Exhibit 1 was 2750 varas and on Hardy's map was from 6100 to 6170 varas.

Mr. Baker further testified in detail concerning each of the above-mentioned oil company maps in connection with the film overlay, and it appears therefrom that the lines shown on such maps were in substantial agreement with appellant's Exhibit 1 and the film overlay, except as to the enlarged lines of the Vairin and the expanded version of that grant.

Mr. Baker also testified that he had taken the description of the land contained in the deed from Tobias A. Wood to James A. McFaddin dated March 19, 1901 (Plaintiff's Exhibit 199) and platted it on Plaintiff's Exhibit 222 (which is also the 1923 Hardy map with over-marking in red lines), and that the calls in such deed were the same calls as shown on Hardy's 1923 map (Plaintiff's Exhibit 35); and that he had

accurately platted on Plaintiff's Exhibit 222 the land covered by the Wood-McFaddin deed, which included land in the Nira, Ramon, Fernet and Vairin. He further testified that from a study of Simpson's work and Hardy's work, the common line of the Vairin and Fernet as shown on the Wood to McFaddin deed was located the same as shown on both Simpson's and Hardy's work.

It thus appears that appellant offered considerable evidence showing that the lines of the various grants south from the McDonough through the upper line of the Vairin (which is the lower line of the Fernet) were properly located by Simpson and Baker; and that the lines of those grants had been recognized in accordance with their call distances for frontage on the Guadalupe River; and that the calls for the Vairin had been expanded and enlarged beyond those contained in the original grant by Surveyor Hardy and by others so that the Vairin would cover the apparent vacancy.

Appellant also points to evidence involving old maps which support his position as to the location of the McDonough and other lines south to the lower line of the Fernet, some of which are as follows: (1) General Land Office Map of Victoria County, Texas, 1895 (Plaintiff's Exhibit 40) which shows the lower line of the McDonough slightly below the junction of the Guadalupe River and Coletto Creek. This map shows by scale the distance from the lower line of the Fernet to the upper line of the Traviesa as being about 5980 varas, as compared with the call distance in the grant of the Vairin of 2750 varas, and also shows a vacancy between the lower line of the Vairin and the upper line of the Traviesa. (2) General Land Office map of Victoria County, Texas, to December 2, 1895 (Plaintiff's Exhibit 20). The statements made in the preceding paragraph are applicable to the last-mentioned map. (3) The Walsh 1879 General Land Office Map (Plaintiff's Exhibit 38), which shows the location of the Gates, Masters, and Westover tracts (sub-

sequently lifted) and which again shows a vacancy between the lower line of the Fernet and the upper line of the Traviesa. (4) The General Land Office map of November 21, 1858 (Plaintiff's Exhibit 36) which again shows a vacancy immediately above and up the Guadalupe River from the upper line of the Traviesa. (5) General Land Office map of Victoria County (H. Lungwitz) (Plaintiff's Exhibit 37) which also shows a large vacancy between the lower line of the Fernet and immediately above the upper line of the Traviesa.

The above referred to Land Office maps supported the existence of a vacancy as contended for by appellant. The testimony of Mr. R. C. Wisdom of the Land Office shows he had not found any additional information which had been furnished to that office which would indicate any reason for amending these older Land Office maps to show no vacancy, and that nothing in the land office records show that the question of vacancy was brought to the Commissioner's attention prior to the Strong applications.

The present General Land Office map of Victoria County, Texas, (1921) (Plaintiff's Exhibit 107) which enlarges the Vairin to include all the "A" vacancy, also by scale shows the distance from the lower line of the Fernet (and the upper line of the Vairin) to the purported lower line of the Vairin and the upper line of the Traviesa to be 5800 varas instead of 2750 varas as called for in the grant.

On the trial below there was admitted much other evidence, particularly many records, grants and maps on file in the General Land Office, which has not been specifically discussed, and I believe need not be under the circumstances. However, I believe it appropriate to point out that in the fall of 1834 when the Guadalupe River Grants were made, Texas Independence was imminent. The Mexican State of Coahuila and Texas had theretofore precluded further colonization contracts on March 26, 1834 by Art. 30 of Decree 272 which pro-

vided "hereafter no colonization contract shall be made, and those heretofore made shall be strictly fulfilled, and in entire accordance with the law of the 24th of March, 1925." See McCurdy v. Morgan, 265 S.W.2d 269, 272 (Tex.Civ.App., San Antonio, 1954, wr. ref.).

*Disposition of "A" Vacancy Contentions.*

Appellant relies in part on the decision of the Supreme Court in Fagan v. Stoner, 67 Tex. 286, 3 S.W. 44 (1887). Appellant particularly points out that Fagan v. Stoner located the upper and lower lines of the Edward McDonough league. Judge Gaines, speaking for the Court concerning the McDonough Grant, said:

" * * * The description of the land in the McDonough grant names neither marked lines nor course. It is as follows: 'Composed of 2,000 Mexican yards, on the Guadalupe river and Coletto creek at their junction, and in the depth on the upper line 12,050 varas, and on the lower line 12,910 varas. It is bounded on the north by said river, on the north-west by vacant lands, on the south-west in the same manner, and on the south-east by citizen Juan Gonzales.' The north-west boundary line of this survey is well established by the evidence. * * * "

Appellant says that Judge Gaines was locating the upper line of the McDonough as located by appellant. After the above, Judge Gaines considered and discussed the evidence to support the trial court's finding concerning the lower line of the McDonough (in the same location as contended for by appellant), and holds that the finding of Judge Pleasants, the trial judge, was correctly made. Appellant also points out that assuming for the moment that the contention of Fagan as to the lower line of the McDonough was correct (i. e., 560 varas down the Guadalupe River from the line as located on appellant's Exhibit 1), there would still be a large "A" vacancy, with the only difference being that instead of a gap of 3,482.6 varas between the lower line of the Vairin and the upper line of the Trav-

iesa, this vacancy would be reduced to 2922.6 varas between such lines, and there would be a consequent small reduction in the excesses on the back line calls and the excess in acreage of the Vairin. In Fagan v. Stoner the Court also said:

"It was also proved by appellants that, beginning some miles below, at the junction of the San Antonio and Guadalupe rivers, and measuring the surveys fronting the river the distance called for in the respective grants, the Gonzales league would not be reached without allowing a large excess in each; but it is not made clearly to appear that this has any bearing upon the case before us. It would seem a violent presumption to suppose that in marking out a line of surveys fronting upon a river the surveyor deliberately disregarded his oath, and gave a uniform large excess to each."

Appellant says that under Fagan v. Stoner, and the law as settled by that opinion, as well as from independent evidence, he has correctly located the grants down the Guadalupe River from the McDonough to the lower line of the Vairin; and that from the evidence, he has correctly located the uper line of the Traviesa. It is the recitation that the Vairin is "bounded * * on the southeast by the league of Dona Josepha Traviesa", which causes the controversy here.

In connection with appellant's position that this "bounded" statement or recitation was a mistake, one of the most material considerations under the "A" vacancy relates to the uncertainty of the location of the upper line of the Traviesa. Under the Jose Maria Valdez Grant, the primary call was for "a north course of 5,800 varas." It further provided, in order to locate this particular 5,800 varas call, that the land "adjoins * * * on the west with the lands of Reverend Father Valdez". The Jose Maria Valdez also provides that after the above call of 5,800 varas (which would have to be located by the adjoinder call to the Father Jose Antonio Valdez two lower leagues of land),

the next call would be "thence to the northeast 2790 varas to the bank of the last named river (Guadalupe)." It thus appears that the upper line of the Jose Maria Valdez Grant was on an open unmarked prairie and not locatable by any artificial or natural monuments. Similarly, the lower line of the Traviesa Grant commenced where the Jose Maria Valdez terminated. Thus, the lower line of the Traviesa was also on an open unmarked prairie, with no locatable monuments or objects. Additionally, the upper line of the Traviesa could be located only by the statement in the grant that it "is comprised of 4430 varas upon the right margin of the Guadalupe River beginning where the lands of Jose Maria Valdez terminates." Thus, again the upper line of the Traviesa was on an open unmarked prairie and is locatable only by a course and distance call from another uncertain unmarked line on the open prairie, i. e., the upper line of the Jose Maria Valdez.

As heretofore stated, I am of the opinion that appellant's evidence was legally sufficient to raise fact issues concerning the alleged vacancies without considering evidence excluded by the trial court, including Fagan v. Stoner and other matters. The discussion which immediately follows is in that context.

As above-stated, appellant argues that the "bounded" recitation in the Vairin, that is, the words "bounded on the * * * Southeast by the league of Dona Josepha Traviesa" was a mistake and cannot and does not control the course and distance calls in the Vairin. In support of that position, appellant relies primarily upon three separate propositions:

(1) A call for course and distance will prevail over a call for an unmarked line on an open prairie, which latter line itself cannot be ascertained except by running a course and distance call from the boundaries of another survey the location of which itself was uncertain.

(2) The extension of the frontage call of the Vairin Grant from 2750 varas to 6232.6

varas (an excess of 3482.6 varas), the enlargement of the east to west call of 3000 varas on the backline of the Vairin to 6417.18 varas (an excess of 3417.18 varas) and the extension of the north-south call in the backline of the Vairin Grant of 760 varas to 2115.82 varas (an excess of 1355.84 varas) causing an increase in the acreage in the Vairin League from a league of 4428.4 acres to a total of 9711 acres, or an excess of 5342.6 acres, both as a matter of evidence and as a matter of law requires that the call for course and distance control and not the "bounded" statement.

(3) The calls for course and distance of the Vairin are controlling here and in any event if the calls for course and distance in the Vairin is to be ignored, the burden rests on the Defendants to prove the footsteps of the surveyor as going beyond the calls for course and distance.

Appellant's original brief, in connection with the "A" vacancy, cites the following authorities: Fagan v. Stoner, 67 Tex. 286, 3 S.W. 44 (1887); Gerald v. Freeman, 68 Tex. 201, 4 S.W. 256 (1887); Duff v. Moore, 68 Tex. 270, 4 S.W. 530 (1887); Castleman v. Pouton, 51 Tex. 84 (1879); Robinson v. Doss, 53 Tex. 496 (1880); Gregg v. Hill, 82 Tex. 405, 17 S.W. 838 (1891); Williams v. Winslow, 84 Tex. 371, 19 S.W. 513 (1892); Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792 (1933); State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228 (Tex. Comm.App. 1936); Humble Oil & Refining Co. v. Ellison, 134 Tex. 140, 132 S.W.2d 395 (Tex.Commn.App. 1939); Caswell v. Faulk, 97 S.W.2d 341 (Tex.Civ.App., Beaumont, 1936, writ refused); Humble Oil and Refining Co. v. State, 104 S.W.2d 174 (Tex. Civ.App., Austin, 1936, writ refused); Petty v. Paggi Bros. Oil Co., 254 S.W. 565 (Tex.Commn.App., 1923, judg. app.); Aransas Pass Colonization Co. v. Flippen, 29 S.W. 813 (Tex.Civ.App., Austin, 1895, n. w.h.); Morgan v. Mowles, 61 S.W. 155 (Tex.Civ.App., San Antonio, 1901, n.w.h.); Holdsworth v. Gates, 50 Tex.Civ.App. 347, 110 S.W. 537 (1908, writ dism.); Benavides v. State, 214 S.W. 568 (Tex.Civ.App., Aus-

tin, 1919, wr. dism.); Love v. Jones, 138 S.W. 1128 (Tex.Civ.App., San Antonio, 1911, n.w.h.); Burke v. Braumiller, 150 S.W. 206 (Tex.Civ.App., Texarkana, 1912, n.w.h.); Stein v. Roberts, 217 S.W. 166 (Tex.Civ. App., Beaumont, 1919, n.w.h.); Prairie Oil & Gas Co. v. State, 229 S.W. 585 (Tex.Civ. App., San Antonio, 1921, n.w.h.); Sansing v. Bricka, 159 S.W.2d 142 (Tex.Civ.App., Amarillo, 1942, writ ref. w. o. m.); Garcia v. Garza, 161 S.W.2d 297 (Tex.Civ.App., San Antonio, 1942, n.w.h.); and Gammel's Laws of Texas, Volume 1 page 125.

After submission of the instant case, the Supreme Court of Texas handed down its decision in the case of C. M. Frost et al. v. Socony Mobil Oil Company, Inc., et al., 433 S.W.2d 387 (decided July 17, 1968, rehearing denied October 2, 1968). Appellant, by letter brief, places reliance on *Frost* and argues that under a fact situation there much less favorable to a vacancy than is presented here, the Supreme Court has in substance sustained appellant's position here with respect to the "A" vacancy. Appellant says that in *Frost* the Supreme Court reaffirmed and readopted the rules relied upon by appellant, and particularly reaffirmed the cases of Humble Oil & Refining Co. v. State, 104 S.W.2d 174 (Tex.Civ.App., Austin, 1936, writ refused); Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792 (1933); and State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228 (1936). Appellees, by reply letter brief, have also discussed briefly the *Frost* decision and in substance reiterate their prior arguments, which will be discussed at a later point in the opinion.

In Frost v. Socony, supra, the trial judge rendered judgment decreeing the existence of a vacancy. The Court of Civil Appeals at El Paso reversed and rendered judgment, 407 S.W.2d 248 (decided July 20, 1966, rehearing denied October 5, 1966, writ of error granted October 4, 1967). The Court of Civil Appeals held as follows:

"We are of the opinion that the controlling facts bring this case within the rule that a call in a junior survey for an ad-

joining existing survey controls over a call for course and distance, and that the trial court erred in failing to apply such law to the facts." 407 S.W.2d 249.

The Supreme Court of Texas reversed the judgment of the Court of Civil Appeals and affirmed that of the trial court, thus sustaining the vacancy asserted by *Frost*. The first paragraph of the opinion (by Justice Walker) reads in part as follows:

"* * * The tract contains 304.51 acres, and the controlling question is whether adjoinder calls in the field notes of Surveys 49 and 50 are to be disregarded in favor of calls for course and distance." 433 S.W.2d 387–388.

In the concluding portion of the opinion in *Frost,* the Supreme Court held in part as follows:

"When all of the facts and circumstances are considered, it is our opinion that the course and distance calls more clearly and certainly reflect the intention of the parties than do the mistaken calls for the unmarked line which Williams did not even attempt to locate on the ground." 433 S.W.2d 401.

In *Frost* the Supreme Court stated the applicable basic rules as follows:

"We recognize the general rule that calls for adjoinder will ordinarily prevail over calls for distance. See Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801; 129 Tex. 547, 104 S.W.2d 1; Cross v. Wilkinson, 111 Tex. 311, 234 S.W. 68. This is so even where the call is for adjoinder with the unmarked but ascertainable lines of an adjacent survey. See Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.2d 773; Maddox v. Turner, 79 Tex. 279, 15 S.W. 237; Phillips Petroleum Co. v. State, Tex.Civ.App., 63 S.W.2d 737 (wr. ref.). *There is, however, an important exception to the general rule, and petitioners insist that the present case is governed by the exception. When it appears that the call for adjoinder was*

*made through mistake, it may be disregarded and the matter is set at large with the court left free to construct the survey in such manner as will best give effect to the intention of the parties as determined from the entire description when read in the light of the surrounding circumstances.* Stanolind Oil & Gas Co. v. State, supra; Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792; Boon v. Hunter, 62 Tex. 582; State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228.

Respondents are correct in saying that a mistaken or conjectural adjoinder call is not necessarily shown by mere variances in distance. Camp v. Gulf Production Co., supra. As pointed out in State v. Sullivan, supra, an 'inconsiderable excess is not of itself evidence that the surveyor was mistaken in the location of the adjoinder for which he called, but, when there is no other evidence of mistake, is usually * * * taken to mean that the mistake was in the measurement or in the calculation of the distance.' See also Giles v. Kretzmeier, Tex.Civ.App., 239 S.W.2d 706 (wr. ref. n. r. e.). *In this instance variances in distance are not the only evidence of mistake."* 433 S.W.2d 396. (Emphasis supplied).

The opinion in *Frost* discusses a number of cases relied on by the parties herein. I agree with appellant that the discussion there of Turner v. Smith, supra; Humble Oil & Refining Co. v. State, supra; and State v. Sullivan, supra, supports appellant's position as to the "A" vacancy.

Appellant's argument as to the "A" vacancy includes the contention that a call for course and distance will prevail over a call for an unmarked line on open prairie, which latter line itself cannot be ascertained except by running a course and distance call from the boundaries of another survey the location of which itself is uncertain. In support of this position appellant cites the following cases: Fagan v. Stoner, 67 Tex. 286, 3 S.W. 44 (1887);

Gerald v. Freeman, 68 Tex. 201, 4 S.W. 256 (1887); Duff v. Moore, 68 Tex. 270, 4 S.W. 530 (1887); Castleman v. Pouton, 51 Tex. 84 (1879); Robinson v. Doss, 53 Tex. 496 (1880); Gregg v. Hill, 82 Tex. 405, 17 S.W. 838 (1891); Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792 (1933); Aransas Pass Colonization Co. v. Flippen, 29 S.W. 813 (Tex.Civ.App., Austin, 1895, n. w. h.); Love v. Jones, 138 SW. 1128 (Tex.Civ.App., San Antonio, 1911, n. w. h.); Stein v. Roberts, 217 S.W. 166 (Tex.Civ.App., Beaumont, 1919, n. w. h.); Prairie Oil and Gas Company v. State, 229 S.W. 585 (Tex.Civ.App., San Antonio, 1921, n. w. h.).

These cases along with *Frost* support appellant's stated position, and I agree with it. Under the evidence in this case, on the present record, it appears that at the time of the Vairin Grant the upper line of the Traviesa was on an open unmarked line on an open prairie, which could be located only by a course and distance call from another unmarked line on an open prairie, i. e., the Jose Maria Valdez upper line, which in turn could be located only by a course and distance call in itself indefinite and uncertain. In view of the evidence herein of mistake in the recitation in the Vairin Grant that it is "bounded * * * on the southeast by the league of Dona Josepha Traviesa", such recitation would not prevail as a matter of law over the course and distance calls for the Vairin under the original grant.

As above-mentioned, appellant's argument as to the "A" vacancy also includes the contention that the extension of the frontage call of the Vairin Grant from 2750 varas to 6232.6 varas (an excess of 3482.6 varas), the enlargement of the east to west call of 3000 varas on the backline of the Vairin to 6417.18 varas (an excess of 3417.18 varas) and the extension of the north-south call in the backline of the Vairin Grant of 760 varas to 2115.82 varas (an excess of 1355.84 varas) causing an increase in the acreage in the Vairin League from a league of 4428.4 acres to a total of

9711 acres (or an excess of 5342.6 acres), both as a matter of evidence and as a matter of law requires that the call for course and distance control and not the "bounded" statement. In support of that contention appellant cites the following cases: State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228 (1936); Humble Oil & Refining Co. v. Ellison, 134 Tex. 140, 132 S.W.2d 395 (1939); Caswell v. Faulk, 97 S.W.2d 341 (Tex.Civ.App., Beaumont, 1936, writ refused); Humble Oil & Refining Co. v. State, 104 S.W.2d 174 (Tex.Civ.App., Austin, 1936, writ refused); Benavides v. State, 214 S.W. 568 (Tex.Civ.App., Austin 1919, wr. dismissed); Sansing v. Bricka, 159 S.W.2d 142 (Tex.Civ.App., Amarillo, 1942, writ ref. w. o. m.); Garcia v. Garza, 161 S.W.2d 297 (Tex.Civ.App., San Antonio, 1942, n. w. h.).

These cases stand for the propositions, among others, that evidence of unreasonable extension of lines or a large excess in quantity of land, contrary to the calls and description in the original grant or survey may raise the issue of mistake and authorize or require the rejection of a call for adjoinder. In the context of this case, where we are considering the correctness of a directed verdict, I would hold that appellant's evidence was legally sufficient to establish the large extensions of lines and the greatly increased acreage in the Vairin, (contrary to the original grant and the law) which would raise the issue and support a finding that the "bounded" recitation (even if considered as a true call for adjoinder) in the Vairin Grant was a mistake; and that in the present state of the evidence, the calls for course, distance and quantity in the original grant may prevail and be given effect.

Appellant's argument as to the "A" vacancy also includes the contention that the calls for course and distance of the Vairin are controlling here and in any event if the calls for course and distance in the Vairin are to be ignored, the burden rests on the defendants to prove the footsteps of the surveyor as going beyond the calls for course and distance. In support of this position appellant cites the following cases: Williams v. Winslow, 84 Tex. 371, 19 S.W. 513 (1892); Petty v. Paggi Bros. Oil Co., 254 S.W. 565 (Tex. Comm.App., 1923, Judg. app.); Morgan v. Mowles, 61 S.W. 155 (Tex.Civ.App., San Antonio, 1901, n. w. h.) Holdsworth v. Gates, 50 Tex.Civ.App. 347, 110 S.W. 537 (1908, writ dism.); Burke v. Braumiller, 150 S.W. 206 (Tex.Civ.App., Texarkana, 1912, n. w. h.).

While these cases support the premise contended for by appellant, I understand his position here to be that after appellant had introduced his evidence the burden of proceeding was then on the defendants-appellees to prove as a matter of evidence the footsteps of the surveyor beyond the course and distance calls in the Vairin Grant. In the present posture of this case, where the trial court directed a verdict at the conclusion of plaintiff-appellant's direct case, the defendants-appellees did not go forward with such burden of proceeding. The argument here advanced by appellant, therefore, furnishes part of the basis for my holding that the directed verdict should not have been granted, and the principles announced in the above-cited cases would be applicable on the new trial.

On the present record and under the above-cited authorities I would hold that there was legally sufficient evidence to raise an issue of mistake as to the recitation in the Vairin Grant that it was to be "bounded—on the southeast by the league of Donna Josepha Traviesa." In this case variances in distance are not the only evidence of mistake. It would not be reasonable or compatible with human behavior to conclude that the commissioner who adjudicated to Vairin one league of 4428.4 acres by correct river frontage and dimension calls intended to grant and in fact granted 9711 acres in violation of the law and his oath. Nor would it be reasonable to conclude that a surveyor would deliberately or even by error make miscalculations or measurements of the magnitude

which would exist if effect is given to the expanded version of the Vairin as constructed or reconstructed by surveyor Hardy and relied on by appellees hereon. On the record before us it is more reasonable to conclude with respect to the "bounded" call in the Vairin for the Traviesa that the parties to the grant were mistaken as to the location of the upper line of the Traviesa or as to the frontage distance between the south or lower line of the Fernet (which is the north or upper line of the Vairin) and the upper line of the Traviesa.

Appellees' motion for directed verdict at the conclusion of appellant's direct case asserted the following grounds concerning the "A" vacancy:

"I.

As to the area described in Section IX of the plaintiff's original petition and designated as MA–56233—4,353.5 acres, those defendants interested in said area urge the following reasons why this Court should instruct a verdict for them and against the plaintiff, to-wit:

1. The evidence introduced by plaintiff shows as a matter of law that the alleged vacancy is included within the external lines of a system of contemporaneous surveys and cannot be vacant within the provisions of Article 5421c, Vernon's Annotated civil Statutes of Texas, because such alleged vacancy would be in conflict with lands previously titled.

2. The evidence introduced by the plaintiff as a matter of law fails to raise an issue of fact as to the existence of any vacant land between the Northwest line of the Maria Josefa Travieso Grant and the Southeast line of the Jose Vairin Grant as such grants were originally granted and adjudicated by the State of Coahuila and Texas to Maria Josefa Travieso and Jose Vairin, and the evidence introduced by the plaintiff and now before this Court as a matter of law

establishes that the Northwest line of the Traviesa Grant and the Southeast line of the Vairin Grant is a common line so as to preclude the existence of a vacancy between the two lines of said grants based upon any legal theory of construction.

3. Plaintiff has failed to prove by competent surveying evidence the location of the Northwest boundary of the Maria Josefa Travieso Grant or the Southeast boundary of the J. Vairin Grant, and therefore any claimed vacancy cannot be located on the ground."

The judgment recites that appellees' motion should be and was granted on the whole case. As to the "A" vacancy the judgment recites that it appeared to the Court " * * * that there is no untitled or vacant land under plaintiff's Mineral Application No. 56233, and that the J. Vairin Survey, Abstract 123, and the Maria Josepha Travieso Survey, Abstract 114, as a matter of law adjoin and have a common line, * * *."

Appellees' counterpoint one, heretofore mentioned, states their basic position concerning the "A" vacancy as follows:

"The lower or southeast line of the Jose Vairin grant is a common line with the upper or northwest line of the Maria Josefa Travieso grant so as to preclude the existence of a vacancy between such lines as a matter of law."

I believe that the preceding discussion concerning the issue of mistake answers appellees' contention in their counterpoint one as to the existence of a common line at the lower Vairin and the upper Traviesa. A fact issue is presented in such respect. The above-stated trial court finding that as a matter of law the Vairin and Traviesa adjoin and have a common line cannot be sustained on the present record and under the rules which must be followed in reviewing a judgment based upon a directed verdict. In my view appellees' argument that we are dealing with a call

for adjoinder which cannot be broken under the evidence in this case so as to preclude the "A" vacancy as a matter of law cannot be sustained.

In addition to the last stated position, appellees advance a number of arguments, briefed in subdivisions under their counterpoint one. None of such arguments is sufficient to defeat the prima facie case made by appellant as to the existence of the alleged "A" vacancy. Otherwise stated, I cannot hold that the "A" vacancy is precluded as a matter of law on any of the theories relied upon by appellees.

One of the arguments advanced by appellees in support of the directed verdict relates to the subject of juridical possession. In their original brief appellees relied upon the following cases: State v. Balli, 144 Tex. 195, 190 S.W.2d 71 (1944), involving Padre Island; State v. Russell, 38 Tex.Civ.App. 13, 85 S.W. 288 (Tex.Civ. App., Austin, 1905); Corrigan v. State, 42 Tex.Civ.App. 171, 94 S.W. 95 (Tex.Civ. App., Austin, 1906, wr. ref.); State v. Corrigan, Tex., 94 S.W. 101 (1906).

Appellees' post-submission brief summarizes their position as to juridical possession as follows:

"What the Commissioner did in placing in possession the various grantees from the confluence up through the McDonough was to put them in possession adjoining each other according to the various tract numbering system shown on the surveyor's plat then in existence. If there was excess it was included in the grants. Whether this supposed excess is to be prorated all the way to the John Daly, or to the McDonough, or between the Fernet and Vairin, or otherwise disposed of in the grants is not material to this case."

Appellant has replied to appellees' argument concerning juridical possession in substance as follows: That the theory of juridical possession does not help appellees; that there is no true delivery of juridical possession here; that assuming a full act of juridical possession, the issue would remain as to what was covered by such act; and on such assumption, also, that the act cannot enlarge or subtract from the grant as made; that if enlargement of the grant is contended for, the act itself is void; that the evidence shows no delivery of juridical possession. Here appellant cites in support of his position the following cases: Pinkerton v. Ledoux, 129 U.S. 346, 9 S.Ct. 399, 32 L.Ed. 706 (1889); United States v. Castro, Fed. Case No. 14,753 (1855) in the trial court and No. 14,754 (1859) on appeal; Dodge v. Perez, Fed. Case No. 3,953 (1872); United States v. Cleveland & Colo. Cattle Co., C.C.Colo., 33 F. 323; Welder v. Carroll, 29 Tex. 317, 318 (1867); Ruis' Heirs v. Chambers, 15 Tex. 586 (1855); Garcia v. State, 274 S.W. 319 (Tex.Civ.App., Austin, 1925, n. w. h.); Benavides v. State, 214 S.W. 568 (Tex.Civ.App., Austin, 1919, wr. dism.). I am in general agreement with appellant's position here, and believe that the cases relied on by appellees are distinguishable. The evidence does not conclusively establish true delivery of juridical possession against appellant in any material respect. In particular, the evidence does not conclusively establish that the commissioner placed Vairin (through his agent Fernet) in possession of land which exceeded the one league, or 4428.4 acres, described in the original grant. In any event, it appears that a question would be presented as to what area was covered by the act of juridical possession and a fact issue would be presented in such respect.

Appellees' remaining arguments under their counterpoint one, concerning the "A" vacancy are all related to the premise that "* * * appellant's theory that the Vairin grant has to be constructed by course and distance from the McDonough lower line is wrong as a matter of law * * *" giving reasons for such contention which will now be considered. It should first be noted that appellees' contentions in the

respect just mentioned relate to construction or reconstruction of the Vairin grant and its location on the ground. Here it appears that the rule stated in *Frost* that "When it appears that the call for adjoinder was made through mistake, it may be disregarded and the matter is set at large with the court left free to construct the survey in such manner as will best give effect to the intention of the parties as determined from the entire description when read in the light of the surrounding circumstances" is applicable. I am unable to hold on the present record that the appellant's theory as to how the Vairin is to be constructed or located is wrong as a matter of law. However, I will discuss appellees' primary contentions in connection with that subject.

One of the arguments made by appellees in such connection relates to the subject of a "system" of surveys. Appellees here contend that the alleged "A" vacancy of 4353.5 acres, as a matter of law, is located within the external lines of a system of contemporaneous surveys (as determined from the field notes of the surveys) and is in conflict on the ground with lands previously titled and is not subject to appropriation under Art. 5421c, V.A.C.S.; that no vacancy can exist in construing interior lines of a system of surveys; and that excess in the system or block must be prorated. Here appellees say that there was a tier of 18 grants made during the period from October 8, 1834 to November 20, 1834 beginning with the J. M. Valdez on the south and running up the Guadalupe and Coletto Creek through the John Daly, and that there is a system within the rules stated by Texas courts. On this phase of the case appellees rely on the following cases: Welder v. Carroll, 29 Tex. 317 (1867); Humble Oil & Refining Company v. Campbell, 350 S.W.2d 364 (Tex.Civ.App., Beaumont, 1961, refused n. r. e.); Duval County Ranch Co. v. Rogers, 150 S.W.2d 880 (Tex.Civ.App., San Antonio, 1941, writ refused); Carmichall v. Stanolind Oil & Gas Co., 256 S.W.2d 129 (Tex.

Civ.App., Amarillo, 1952, writ refused); Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801, 104 S.W.2d 1 (1937); Austin v. Espuela Land & Cattle Co., 107 S.W. 1138 (Tex.Civ.App.1908).

The 18 grants relied on by appellees include 9 grants made from the J. M. Valdez through the McDonough, heretofore discussed, and an additional 9 grants on the Coletto Creek upward or northwest from the McDonough. Appellant, by reply brief, has responded to appellees' argument now being considered by an extensive review of the facts and applicable law in support of his contention that there is no system or block of surveys here and the "A" vacancy of 4353.5 acres cannot be prorated upon the various grants.

The theory of prorating an excess proportionately between grants is widely known and referred to as the Pennsylvania rule, since it apparently originated in the courts of that State. Under the rule, in order to constitute a block or system a number of requirements must all be met, generally as follows: (1) The exterior lines of the block must have been first surveyed; (2) The tracts composing of the block are located in a body without interior lines; (3) The block or system must have been surveyed at the request of one owner, covering a number of tracts; (4) The block must have been surveyed by one surveyor as part of the same work; (5) The survey must have been returned to the granting authority by the same surveyor all at the same time. See Ferguson v. Bloom, 144 Pa. 549, 23 A. 49 (Pa. Sup.Ct.1891); Morrison v. Seamans, 183 Pa. 74, 38 A. 710 (Pa.Sup.Ct.1897); Clement v. Packer, 125 U.S. 309, 8 S.Ct. 907, 31 L.Ed. 721 (1888). The Texas cases follow substantially the same rules. See Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801 (1937); Lynn v. Manning, 297 S.W.2d 687 (Tex.Civ.App., Austin, 1957, wr. ref. n. r. e.); State v. Jones, 184 S.W.2d 510 (Tex.Civ.App., El Paso, 1944, n. w. h.); Duval County Ranch Co. v. Rogers, 150 S.W.2d 880 (Tex.Civ.

App., San Antonio, 1941, wr. ref.); Hamman v. San Jacinto Rice Co., 229 S.W. 1008 (Tex.Civ.App., Galveston, 1921, dismissed by agreement in Supreme Court 247 S.W. 500 (1923); Brooks v. Slaughter, 218 S.W. 632 (Tex.Civ.App., Amarillo, 1920, n. w. h.), on subsequent appeal 232 S.W. 856, n. w. h.); Taft v. Ward, 58 Tex. Civ.App. 259, 124 S.W. 437 (Tex.Civ.App., San Antonio, 1910, n. w. h.).

Here again I am in general agreement with appellant's position and believe that extended discussion is not called for. The evidence does not conclusively establish a system or block of surveys within the judicial definition of same, and, in its present state strongly tends to establish that such system or block does not exist, and proration of excess would not be authorized in fact or in law.

In particular the evidence before us tends to establish that the external lines of a system or block were not fixed or surveyed; that the various grants or surveys were not made by the same surveyor as a part of the same piece of work; that the surveys were not made at the same time by the surveyor for the same parties; that the lines of the separate Guadalupe River Grants (which were fixed to allow the quantity of land limited by law), were the controlling factors to the parties. The lines of such grants were interior lines of a larger area. Even if the Guadalupe River could be considered as one external boundary of a system or block, it appears that some or all of the remaining exterior lines would be in doubt, and in any event would not be conclusively established on the present record. The evidence herein further shows that in a number of the grants (which under appellees' theory would be part of a system) it is recited that there are vacant lands on one side or the other and that a number of the grants were made before others were applied for. The Texas cases which most strongly support appellant's position concerning the absence of a block or system of surveys are Lynn v. Manning, supra; State v.

Jones, supra; Hamman v. San Jacinto Rice Co., supra; Brooks v. Slaughter, supra; and Taft v. Ward, supra.

Appellees' remaining arguments concerning the "A" vacancy as to construction or reconstruction of the Vairin Grant are in substance as follows: That assuming appellant has located the upper line of the Traviesa and the lower line of the McDonough as called for in their original grants, the Vairin cannot be constructed as an independent survey by course and distance from the McDonough because the calls in the Vairin do not connect with the McDonough or any objects called for in its description or field notes; that when a survey is to be constructed by course and distance, it has to be constructed from the nearest and established line, corner or object with which its field notes connect; that the Traviesa northwest or upper line is a fixed line, as pleaded by plaintiff, and the "bounded" call in the Vairin is thus for an artificial object, and the lower Vairin line should be constructed or located by locating the upper Traviesa line; that under the undisputed facts here, an excess between the lower McDonough line and the upper Traviesa line is titled as a matter of law and must be prorated.

I believe that the preceding discussion largely covers each of the last-mentioned contentions. Some of them involve appellees' theory that the Guadalupe River grants must be built or located upward from the Traviesa. I am unable to hold as a matter of law that such position is correct. The evidence shows that prior to this case no one has attempted to use this method as the proper one by which to locate the various grants. As hereinbefore discussed, the evidence discloses considerable past uncertainty concerning the location of the Traviesa lines. But if they are considered to be established as contended for by appellant on the basic "A" vacancy, and as shown by the Hardy report and if appellees' theory of construction upward from the Traviesa is fol-

lowed, the locations of the various upriver grants, if given their river frontages and descriptions as in the original grants would be upset, and would be contrary (unless the expanded version of the Vairin is used) to much of the evidence, including the Hardy report itself.

Appellant's points complaining of the directed verdict against him, because fact issues were presented by the evidence concerning the "A" vacancy are well taken, and I would hold that his points one, two, four, five and six should be sustained.

### The "B" Vacancy

Appellant's Group "B" Points, relating to the 2618.94 acre vacancy, are as follows: (I have heretofore noted that the briefs contain slight variations in the recitation of the fraction of an acre following the figure of 2618 acres involved in the alleged "B" vacancy.)

### Point Eight

The Court erred in sustaining Defendants' Motion for Instructed Verdict.

### Point Nine

The Court erred in sustaining Defendants' Motion for Instructed Verdict insofar as the same relates to the 2618.24 acre vacancy described in Plaintiff's Original Petition.

### Point Ten

The Court erred in sustaining Defendants' Motion for Instructed Verdict as to the vacancy of 2618.34 acres as described in Plaintiff's Original Petition because as a matter of law and under the undisputed evidence the location of the Jose Antonio Valdez Four League Grant of June, 1824 the location of the land covered by the Jose Antonio Valdez to John Cameron conveyance of the 27th day of October, 1834 and the two league

confirmation of John Cameron October 30, 1834 was known to the Applicant for the Traviesa Grant and under the undisputed evidence the Cameron Two League Conveyance and Grant covered the 2618.-34 acres referred to in Plaintiff's Original Petition and by reason of such facts the Traviesa Grant could under no circumstances include said 2618.34 acres and could not be enlarged by the subsequent declaration of invalidity of the Cameron Two League Confirmation with the result that as a matter of law and under the undisputed evidence said tract of 2618.34 acres, plus the 460.45 acres hereinafter referred to in points 13, 14 and 15, became vacant, unappropriated lands of the State of Texas and subject to application.

### Point Eleven

The Court erred in sustaining Defendants' Motion for Instructed Verdict as to the vacancy of 2618.34 acres described in Plaintiff's Original Petition because under Plaintiff's evidence introduced in this cause the location of the Jose Antonio Valdez Four League Grant of June, 1824, the location of the land covered by Jose Antonio Valdez to John Cameron conveyance on the 27th day of October, 1834, and the Two League Confirmation of John Cameron, October 30, 1834, was known to the applicant for the Traviesa Grant and under the undisputed evidence the Cameron Two League Conveyance and Grant covered the 2618.-34 acres referred to in Plaintiff's Original Petition and by reason of such facts the Traviesa Grant could under no circumstances include said 2618.34 acres and could not be enlarged by a subsequent declaration of invalidity of the Cameron Two League Confirmation with the result that under the evidence said 2618.34 acres plus the 460.45 acres referred to in Points Thirteen, Fourteen and Fifteen below became vacant unappropriated lands of the State of Texas and subject to application.

## Point Twelve

The Court erred in sustaining Defendants' Motion for Instructed Verdict against Plaintiff's Claim of vacancy for the tract of 2618.34 acres described in Plaintiff's Original Petition and as shown on Plaintiff's Exhibit No. 1.

## Point Thirteen

The Court erred in sustaining Defendants' Motion for Instructed Verdict as against Plaintiff's claim that there now exists vacant unappropriated lands within the boundaries of the Lower Father Valdez-Cameron Two Leagues of Land.

## Point Fourteen

The Court erred in holding as a matter of law that there remains no vacant, unappropriated public lands within the boundaries of the Lower Father Valdez-Cameron Two Leagues of Land.

With respect to the alleged "B" vacancy of 2,618.94 acres (this being a 3,079.39 acre vacancy less the "C" vacancy of 460.-45 acres also covered in the "A" vacancy) appellant's position is in substance as follows: There was a four-league grant made by the Mexican State of Coahuila and Texas to Father Jose Antonio Valdez in 1824, but the description of the grant is such that it is not at the present time locatable by identifiable physical objects. Father Jose Antonio Valdez acquired his Priesthood by being a chaplain in the Mexican Army. Maria Josepha Traviesa was his wife, and Jose Maria Valdez was his son. After the grant, Father Valdez lived on his land and used and occupied it until at least 1836. The location of the four-league grant was well recognized and located on the ground. On September 20, 1834, Jose Maria Valdez, in behalf of his mother, Maria Josepha Traviesa, petitioned for a grant of land to be "located so as not to conflict with the boundaries of the Parish Priest of his Town". The subsequent grant to Maria Josepha Traviesa, on October 8, 1834 (which has at least one missing call in its description), recites that the grant is "bound * . * * on the southwest by the Priest Valdez." On October 27, 1834, Father Jose Antonio Valdez conveyed his two lower leagues to John Cameron. This grant was confirmed by the State of Coahuila and Texas to Cameron on October 31, 1834 and it is locatable by the description contained in the grant. This grant was confirmatory of the previous titles and descriptions of the lower leagues previously granted to Father Valdez. After the confirmatory grant to Cameron, Maria Josepha Traviesa and her son, Jose Maria Valdez, recognized the Cameron lines as being the lines of the original lands of Father Valdez.

The acreage involved in the "B" vacancy (2618.94 acres) when added to that in the "C" vacancy (460.45 acres) totals 3079.39 acres is a part of the lands embraced in the Cameron two league grant. The location of the Cameron grant is shown by the evidence, including various maps. In 1881, the Texas Supreme Court in Kleiber v. Stockdale (apparently without written opinion) affirmed the judgment of the trial court which held the Valdez-Cameron Grants void (on grounds which did not involve boundary questions), thus leaving as vacant and unpatented all the lands previously covered by the Cameron two-league conveyance and grant. Subsequent patents have covered a considerable portion of the Cameron two-leagues area, as is shown by appellant's exhibit 1. The above-mentioned 3079.39 acres is that portion of the Cameron two-league area not subsequently patented by the State of Texas. On the present record there is no real dispute as to the location of the subsequent patents.

The principal question with respect to the "B" vacancy is whether the voiding of the Valdez-Cameron Grants could operate to expand and enlarge the Traviesa Grant beyond the area previously and actually covered by that grant. In connection with the "B" vacancy, it is appellant's primary position that Father Valdez' four-league grant

made in 1824 was well located on the ground; it was occupied by him and its boundaries well known to his family and to the community; the conveyance to John Cameron of the two-leagues and the confirmation by the State to Cameron definitely, by description, with accurate field notes located the land on the ground; the 1834 application for the Maria Josepha Traviesa Grant was for lands "not to conflict" with the land of Valdez-Cameron and was bounded by the Father Valdez lands. Appellant says that under these circumstances, the location of the Valdez-Cameron two-leagues controls over the Traviesa; that this was recognized by Maria Josepha Traviesa and her son, and by the documentary evidence until the Valdez-Cameron Grants were declared void in 1881. Appellant's position then is that the subsequent voiding of the Valdez-Cameron Grants could not operate to enlarge the Traviesa Grant, and since the junior patents have not included all of the lands formerly in the Valdez-Cameron two-leagues, that part not subsequently patented is vacant, unappropriated Public Free School Lands and subject to appellant Strong's application.

Appellant's statement in his original brief concerning the "B" vacancy and the evidence relating to it covers thirty-six printed pages and will here be referred to only in summary form. Father Jose Antonio Valdez (father of Jose Maria Valdez and the husband of Maria Josepha Traviesa) received a four-league grant in 1824 as above-mentioned. When Jose Maria Valdez (the son of Father Valdez) petitioned for a grant in behalf of his mother, Maria Josepha Traviesa, on September 20, 1834, he prayed that the land be located "so as not to conflict with the boundaries of the Parish Priest of this town." This was followed by the grant to Maria Josepha Traviesa which recites that the grant is "bounded * * * on the Southwest by the Senor Priest Valdez * * *". Additionally, by application dated September 19, 1834, Jose Maria Valdez (the same son of Father Valdez) for himself and his son Andelicio Valdez, applied for a league of land "adjoining the lower lines of the Senor Priest of Goliad, Bachelor Jose Antonio Valdez" and the grant dated October 8, 1834 provides that the land is "bounded on the north by vacancy lands (this later became the Traviesa Grant); on the west by the Priest Valdez * * *". This supports the view that the Father Jose Antonio Valdez lands had a definite location which was established prior to that of the Traviesa. The application of September 19, 1834, for the Jose Maria Valdez and the application of September 20, 1834 for the Traviesa, both show that the Father Valdez lands were previously located and recognized.

The conveyance by Father Jose Antonio Valdez of the two lower leagues of his four leagues to Cameron on October 27, 1834 recites that the land "adjoins on the east with lands of the Citizen Jose Maria Valdez, on the south with the San Antonio River, on the west with the lands of same Priest and on the north with vacant lands (which later became the Traviesa) and whose boundaries were definitely settled lately by the Surveyor Citizen Saml. A. White * * *". Appellant says that this shows that when White surveyed the Valdez-Cameron two leagues, what later became the Traviesa lands were then "vacant lands", thus necessarily proving the seniority of White's survey of the Valdez-Cameron two leagues. After the confirmatory grant to Cameron, Maria Josepha Traviesa acting under power of attorney from her son, Jose Maria Valdez, by deed dated October 5, 1852, conveyed certain land out of the Jose Maria Valdez Grant to John Twohig and recited in this conveyance "this also is the lower line of the grant of land made to Jose Antonio Valdez. Thence north with the boundary line of said J. A. Valdez land which at present belongs to Dr. Cameron five thousand eight hundred varas to a corner in the prairie * * *.", thus recognizing and confirming the previous location of the

Valdez four-league grant and the 2-league confirmation to Cameron.

There is, therefore, the 1824 location and grant to Jose Antonio Valdez, the application of Father Valdez' son (Jose Maria Valdez in behalf of his mother, Maria Josepha Traviesa) for land "not to conflict" with the location and survey of Father Valdez, the description of the Traviesa league as being bounded on the southwest by the lands of Father Valdez, the description of the Jose Maria Valdez as "adjoins * * * on the west with the lands of Reverend Father Valdez" and the recognition and confirmation by Maria Josepha Traviesa of the prior grant and survey of the Valdez-Cameron by the deed to John Twohig in 1852. Appellant's evidence thus tends to establish the priority of the Father Valdez-Cameron location and survey over the Traviesa; and this is also shown by the fact that the Jose Maria Valdez grant can be located only by reference to the Father Valdez-Cameron lines, and in turn the Traviesa can be located only by reference to the Jose Maria Valdez upper line. There is apparently no other way to locate the Traviesa.

The primary call in the Jose Maria Valdez grant is "a north course with five thousand eight hundred varas." The location of this 5800 vara line can be ascertained only by the reference in the grant to the fact that this line is "bounded * * * on the West by the Priest Valdez * * *". In order to locate this 5800 vara line the prior existence and location of the Father Valdez-Cameron lines must be acknowledged and used. Similarly, the primary call in the Traviesa Grant locates the Traviesa as "beginning where the lands of Don Jose Maria Valdez terminate." It thus appears that the evidence in the present record is legally sufficient to show the prior existence and location of the Father Valdez-Cameron lines and their use as the basis for location of the Traviesa.

Under these circumstances, but for a subsequent declaration of invalidity of the Valdez-Cameron leagues grant in Kleiber v. Stockdale in 1881 it appears there would be no question but that Valdez-Cameron Grant would be entitled to its full location.

Additionally, appellant's evidence shows that the patent on the C. O. Edwards survey does not call for a joinder of the Traviesa; the patent of 1896 to C. R. Mann does not call for a joinder of the Traviesa; the patent to Mary Kay in 1885 does not call for such a joinder; the patent to Nancy Miller in 1889 states only "thence a said line north 10° east 484 varas to a stake for corner, established for claimed bdy. of said Traviesa league." The original field notes for the Foster Lewers in a survey made by A. Hensoldt on May 2, 1863, filed in the Land Office May 20, 1863, did not call for a joinder with the Traviesa. Those field notes were amended by a survey made on behalf of J. A. McFaddin on June 6, 1896 to call for a joinder with the line of the Traviesa. This occurred after the adjudication of the invalidity of the Cameron Grant. A number of patents were granted by the State of Texas upon the Cameron Surveys, but it appears that this McFaddin patent is the only one expressly calling for joinder with the Traviesa.

The official map for Victoria County dated December 2, 1895 and the land office map of 1895, both show the Cameron as originally granted and limit the Traviesa so as not to conflict with the Cameron. These maps are in accord with appellant's position.

The location of the Traviesa respecting the Cameron is also shown on the following maps:

"Map of Power & Hewitson Colony, dated March 20, 1841—from Atlas B, p. 10, General Land Office (Plaintiff's Exhibits 18 and 19).

Map—Victoria County—dated about 1847 —Atlas A. p. 1, General Land Office (more legible copy taken from records of District Court in Refugio County,

in the case of Withers v. O'Connor). (Plaintiff's Exhibit 17)

When the above-mentioned evidence is considered, it appears that fact issues were also presented concerning the "B" vacancy of 2618.94 acres as shown on appellant's Exhibit 1 and plats numbers 1 and 2 hereinbefore set out. It further appears that under the evidence the Valdez-Cameron two-league survey as located could be found to be located on the ground prior to the Traviesa Grant and that this was recognized by Maria Josepha Traviesa and Jose Maria Valdez.

Under the evidence it also appears that the Valdez-Cameron location could control over the Traviesa irrespective of the calls of the Traviesa. Otherwise stated, the Valdez-Cameron Grant appropriated the land; and the Traviesa Grant, being in recognition of and subordinate to that survey could be found not to include the lands then included in the Valdez-Cameron two leagues.

I agree with appellant that under the present record the subsequent voiding of the Valdez-Cameron Grant did not operate to enlarge the Traviesa.

In Shindler v. Lutcher & Moore Lumber Co., 107 S.W. 941 (Tex.Civ.App., Galveston, 1908, n.w.h.) the Court held that where a survey was established on the ground and a subsequent survey was made of adjoining land, necessarily the calls in the subsequent survey are limited by the first survey and the fact that for some reason the first survey, or the patent issued pursuant thereto, was declared void would not alter this situation. The Court held in part as follows:

"* * * But appellant contends that the Hickman survey called for in the Davlin field notes is not the present survey of one-half league, but that it is indisputably shown by the map of M. B. Lewis made in 1839 to have been the original league location, subsequently abandoned, and that, therefore, the facts in the case, in view of the seniority of the Davlin field notes and this explanation of the call for the Hickman survey, do not raise a contention that the Davlin survey is limited in going westward to the line which defendants now call the east line of the present Hickman survey, but that the Davlin is necessarily by course and distance carried at least 6,200 varas west of the Droddy labor.

"The map of Lewis shows the east line of the Hickman to extend some distance south of the south line of the Davlin, and further shows that the Davlin intersects it as called for, though possibly not at the distance stated in the Davlin field notes. We have been unable to find in the record that the Hickman survey as shown on the Lewis map was ever abandoned, and, if there was evidence to that effect, appellant has failed to point it out in his brief. But, however that may be, it is evident that a Theophilus Hickman survey has been made on the ground prior to the Davlin location, and the east line and northeast corner marked and established, and that the surveyor in making out the field notes of the Davlin, knowing of the Hickman location, intended to run from the river westward no further than necessary to reach the latter survey. This being true, and the evidence leaves no doubt that it is true, the call for distance in the Davlin south line must yield to the call for the east line of the Hickman. Woods v. Robinson, 58 Tex. 661; Besson v. Richards, 24 Tex.Civ.App. 64, 58 S.W. 613; Anderson v. Stamps, 19 Tex. [460] 465; McCown v. Hill, 26 Tex. 359; Maddox v. Fenner, 79 Tex. [279] 291, 15 S.W. 237; Rand v. Cartwright, 82 Tex. [399] 403, 18 S.W. 794. The assignments are overruled."

Under the same reasoning, appellant says that here since the Valdez-Cameron Grant had appropriated at that time the land called for by it, and since these were well located on the ground, such location appropriated the land and no grant of the

Traviesa could take away or cover the lands theretofore in the Valdez-Cameron leagues, nor did it purport to do so.

In Ruth v. Carter-Kelly Lumber Co., 286 S.W. 322 (Tex.Civ.App., Beaumont, 1926, n.w.h.), the Court held in part:

"* * * It is clear that under this well-established rule, where a junior survey is undertaken to be established and located by calls for the corners and lines of older and well-established surveys, it must be made to conform to, coincide with, and harmonize with the lines and calls of the older surveys, and that any erroneous calls of the junior or locative survey cannot be made to control or change the location of the older surveys, especially when the older survey contains in its own calls elements of complete description and identity. Under such circumstances, the junior survey must be located by the older and not the older by the junior. So, in the instant case, any discrepancies or mistaken calls for distance in the location of section 9 will not operate to render the grant void or to change the location of either the older surveys for the lines or corners of which calls are made in the field notes of section 9, but the calls in section 9 will be made to conform to and will be controlled by the calls for the established and identified corners of the older surveys."

See also, Southern Pine Lumber Co. v. Whiteman, 163 S.W.2d 212 (Tex.Civ.App., Texarkana, 1942, wr.ref. w.o.m.); and Arrott v. Smith, 225 S.W.2d 639 (Tex. Civ.App., Austin, 1949, n.w.h.).

Under the present record and the above cases it appears that since Maria Josepha Traviesa at the time she received her grant knew the location of the lower leagues previously granted to her husband Jose Antonio Valdez and later recognized by her in writing to be owned by John Cameron; and since her application specified that her league should be located not to conflict with it and the grant to her contained a description of similar effect, there is no conclusively established basis for a holding that the grant to Maria Josepha Traviesa conveyed title to land embraced within the boundaries of the Valdez-Cameron leagues. The later adjudicated invalidity of the grants to Valdez and Cameron would not operate to enlarge the Traviesa boundaries to include lands not formerly a part of that grant. That a subsequent determination of invalidity cannot operate to enlarge the adjoining grant has been held in Welder v. Carroll, 29 Texas 317, 318, 334 (1867), wherein the Court, at page 334 said:

"* * * Nor can the boundary of one be enlarged by reason of the other being pronounced invalid by the courts years afterwards, if we could consider that matter in the present record * * *."

The rule in Welder v. Carroll has been followed as shown by Kirby Lumber Co. v. Gibbs Bros. and Co., 14 S.W.2d 1013 (Tex.Commn.App., 1929, judg.app.), wherein the Court said:

"This rule of priority of surveys is not questioned by defendant in error, but it is denied that the rule is applicable to this case upon the contention that the original survey of both tracts involved was made without any authority of law and the same was therefore void, the precise point being that the surveyor acted beyond his jurisdiction. The plaintiff in error combats that proposition, and insists that the surveys were not void, but that the acts of the deputy surveyor were within his statutory authority. Be that as it may, we are of the opinion the matter is entirely immaterial. It may be conceded, as it must be, that if the deputy surveyor, surveying the Smith in 1838, had no authority to act, then his attempted act was invalid and the survey was a nullity so far as it created any rights as appropriation of the public domain. We may also admit, for the purpose of decision, that the deputy surveyor did act without

authority, and that the survey was thus void. Non sequitur, that the call in the subsequent patent to the McWilkinson (senior, however, to the patent to the Smith) was void. The ineffectiveness of the survey to appropriate the land or to create any rights whatever in Charles Smith or his heirs does not affect the question of the beginning corner and east boundary line of the McWilkinson. That is determined by the calls of the field notes, as contained in the patent. The primary purpose of every inquiry like this is to ascertain where on the ground the surveyor actually laid the land, or where the grantor actually intended it to be located when there was no actual survey. To determine this all-important matter any call sufficiently clear and definite to determine location will be observed. Where that call, as here, is for an adjoining survey, it can make no difference that such survey is for any one reason invalid. It is not a question of validity of the survey called for, but rather one of the corner or line of such so-called survey. The beginning point is not a legal concept, but a physical object. Whether the survey this called for is void or valid, or the line thereof is legal or illegal, is of no importance. It may be the act of an individual, not a surveyor at all. It is a question of where the surveyor or grantor did place, or meant to place, the subsequent tract. Welder v. Carroll, 29 Tex. 318."

I would hold that under the evidence introduced on the trial below that there was legally sufficient evidence to raise an issue as to the "B" vacancy of 2618.94 acres as shown on appellant's Exhibit one. In my view, appellant's points eight, nine, eleven, twelve, thirteen and fourteen should be sustained.

### The "C" Vacancy

Appellant's Group "C" Points, relating to the 460.45 acre vacancy, are as follows:

### Point Fifteen

The Court erred in sustaining Defendants' Motion for Instructed Verdict insofar as the same relates to the 460.45 acre vacancy described in Plaintiff's Original Petition.

### Point Sixteen

The Court erred in sustaining Defendants' Motion for Instructed Verdict with respect to the tract of 460.45 acres as described in Plaintiff's Original Petition and being a part of the 4353.5 acre vacancy because as a matter of law and under the undisputed evidence the Jose Antonio Valdez Grant (June, 1824), the Jose Antonio Valdez to Cameron Two League Conveyance, October 27, 1834, and the Confirmation of Title to Cameron October 30, 1834, show the said 460.45 acres as originally a part of the Cameron Grant and that said Grant, Conveyance and Confirmation separately and collectively are prior and superior to the Fernet and Vairin Grants, and therefore under the undisputed evidence irrespective of any reasons given for the existence of the 4353.5 acre vacancy (referred to in Points One to Seven herein) said 460.45 acres under no circumstances has become a part of the Vairin Grant and the fact that under the undisputed evidence the Cameron Grant was subsequently held void does not and could not operate to enlarge the area covered by the Vairin Grant and said Tract of 460.45 acres is vacant, unappropriated lands of the State of Texas and subject to application.

### Point Seventeen

The Court erred in sustaining Defendants' Motion for Instructed Verdict with respect to the 460.45 acre vacancy as described in Plaintiff's Original Petition and being a part of the 4353.5 acre vacancy referred to in Points One to Seven herein, because under the Plaintiff's evidence introduced in this cause the Jose Antonio Valdez Grant (June, 1824), the

Jose Antonio Valdez to Cameron Two League Conveyance October 27, 1834, and the Confirmation of Title to Cameron of October 30, 1834, show the said 460.45 acres as originally a part of the Cameron Grant and that said Grant, Conveyance and Confirmation are separately and collectively prior and superior to the Fernet and Vairin Grants and therefore under the evidence irrespective of the reasons given in Points One to Seven for the existence of the 4353.5 acre vacancy, said 460.45 acres under no circumstances has become a part of the Vairin Grant and the fact that under the undisputed evidence the Cameron Grant was subsequently held void, does not and could not operate to enlarge the area covered by the Cameron Grant and said tract of 460.45 acres is vacant, unappropriated lands of the State of Texas and subject to application.

The statements made concerning appellant's Group "B" points (8–14) relative to the "B" vacancy are material to the "C" vacancy in connection with the location of the Father Jose Antonio Valdez four leagues and that the deed from Father Valdez to John Cameron, dated October 27, 1834, recited that the two leagues conveyed were located "adjoining on the east with the lands of Citizen Jose Maria Valdez, on the South with the San Antonio River on the west with the lands of the same Priest and on the north with vacant lands and whose boundaries were definitely settled lately by the surveyor citizen Samuel A. White and conformed to with the directions of the Commissioner of the Supreme Government * * *." Appellant says that it is clear as of the time of that conveyance, the Vairin, even assuming that it extends down to the Traviesa, had not been surveyed; and no grant had then been made to Vairin, and was not made until October 29, 1834. Appellant further says that taking the subsequent petition of Cameron on October 30, 1834, and the confirmatory adjudication to him on October 31, 1834 and the definite description contained in it, there is no question but that at such time the Vairin had not been located on the ground. Appellant's position then is that if for any reason appellees are able to extend the Vairin to more than double its calls for frontage and acreage, there is still no question but that the Cameron two league survey and location is superior to that of Vairin and would control over it. Appellant says here again that the boundaries of the entire Father Jose Antonio Valdez four-league grant was known and recognized because in the Vairin Grant of October 29, 1834 it is recited that the Vairin is bounded "on the Southwest by lands, occupied by the Senor Priest Valdez" and an examination of the various maps in evidence show that the upper two leagues of the Jose Antonio Valdez four-league grant would join with the Vairin; and this is particularly true concerning the 460.45 acres protruding into the vacancy as shown by General Land Office Map of December 2, 1895, the General Land Office Map of 1895, and the 1879 General Land Office Map. These latter three maps show 460.45 acre triangle as extending over and above the north line of the Traviesa and consequently having priority over the Vairin, even assuming the Vairin's calls and quantity are more than doubled (contrary to appellant's points One to Seven). Appellant points to the official General Land Office Map of 1895 and also to his Exhibit One to show that the triangle of 460.45 acres is clearly shown on both. Appellant emphasizes the extent to which the recent survey on the ground by Simpson disclosed the same fact situation as was reflected by the land office records in 1895. At that date although the Supreme Court of Texas had declared the grant of the Cameron leagues invalid, the Land Office map still showed their location and the boundaries and location of junior patents as then surveyed and patented on the Cameron lands.

The field notes of Fielding Jones and Hoyd surveys in this connection tend to show that the 460.45 acre tract (the "C"

vacancy) cannot be included in or covered by either the Vairin or Traviesa Grant or any other patent. The field notes of the Hoyd survey, which was patented on June 21, 1851, read as follows: "Beginning at the S.W. corner of the upper league granted to Jno Cameron. A stake from which a white (Mkd X) brs N 48° E 8½ vrs. An elm marked + brs S 75° E 9 varas Thence up the San Antonio River N 50° W 90 vrs. S 59 W 200 vrs. N 76° W 450 vrs. N 66° W 380 Vs. S 54 ½ W 476 vrs. to a large forked cottonwood mkd X from which another mkd + brs N 67° E 12 vrs. Thence N 14° E 6068 vs. to a post in mound Thence S. 76° E at 1444 vs a post in mound; Thence South 14° W with the W line of said Cameron grant at five thousand seven hundred and sixteen varas the place of beginning." The field notes of the Fielding Jones patent No. 585, Volume 5, patented to S. A. White, assignee, on January 6, 1851, read as follows: "Beginning at the N.W. corner of a survey of 301 acres for S. A. White, Assignee of F. Jones, a post. Thence South 16° East with the N. line of said survey at 316 varas the N.E. corner, and with the N. line of John M. Raines Survey, one thousand five hundred and fifty-six varas to a stake in a mound. Thence North 14° East with the W. line of said Survey for S. A. White four hundred and thirty two varas to a post in mound. Thence South 76° East, with the N. line of said survey one thousand four hundred and forty four varas to its N.E. corner, a post in mound. Thence North 14° East with the W. line of J. Cameron, one thousand and sixteen varas to a post in mound. Thence North 76° West, three thousand varas to a post in mound. Thence South 14° West, one thousand four hundred and forty eight varas to the place of beginning." The East lines of both of these surveys are by their calls common lines with the upper or west line of the upper Cameron league and of the 460.45 acre tract which is in the northwest corner of the upper Cameron. Otherwise stated, the evidence is legally sufficient to show that the triangle of land east of this line is part

of the Cameron. It was so identified in 1851 by the Hoyd and Jones junior patents. It was a part of the Cameron land in 1881 when the Cameron was voided. No patent has purported to cover this tract since that date.

Appellant says that under any view of the evidence it is clear that the 460.45 acre vacancy was shown to exist. I would hold that fact issues were presented by the evidence concerning the existence of the "C" vacancy, which precluded the directed verdict and judgment for appellees. In my view appellant's points fifteen and seventeen should be sustained.

*The Alternate "A" Vacancy (1855.3 acres)*

Appellant's Group "D" Points, relating to the alternative 1855.3 Acre Vacancy, are as follows:

### Point Eighteen

The Court erred in sustaining Defendants' Motion for Instructed Verdict insofar as the same relates to the vacancy of 1855.3 acres as described by Plaintiff's Exhibit 12-C, Plaintiff's Exhibit 229 and as set forth and as shown on Plaintiff's Exhibit 12-F.

### Point Nineteen

The Court erred in sustaining Defendants' Motion for Instructed Verdict as to the vacancy of 1855.3 acres as described by Plaintiff's Exhibit 12-C and Plaintiff's Exhibit 229 and as set forth and shown on Plaintiff's Exhibit 12-F, because as a matter of law and under the undisputed evidence in this case the southerly or lower line of the McDonough Grant is correctly located on Plaintiff's Exhibit No. 1, the Gonzales Grant, the Rodriguez Grant, the Nira Grant, the Ramon Grant, and Fernet Grant are locatable only by calls for course and distance and the southerly or lower line of the McDonough Grant and in the alternative if

the upper or northerly line of the Traviesa Grant is not as shown on Plaintiff's Exhibit No. 1 then in the alternative under the evidence, the upper or northerly line of the Traviesa Grant would be at the location as shown on Plaintiff's Exhibit 12-F and taking the calls for course and distance down from the lower or southerly line of the McDonough Grant under the evidence there would exist a vacancy of 1855.3 acres from the southerly or lower line of the Vairin Grant and this alternate upper line of the Traviesa Grant, which said tract is vacant unappropriated lands of the State of Texas and subject to application.

## Point Twenty

The Court erred in sustaining Defendants' Motion for Instructed Verdict as to the vacancy of 1855.3 acres as described by Plaintiff's Exhibit 12-C and Plaintiff's Exhibit 229 and as set forth and shown on Plaintiff's Exhibit 12-F, because under the evidence in this case the southerly or lower line of the McDonough Grant is correctly located on Plaintiff's Exhibit No. 1: The Gonzales Grant, the Rodriguez Grant, the Nira Grant, the Ramon Grant and the Fernet Grant are locatable only by calls for course and distance from the southerly or lower line of the McDonough Grant and in the alternative is the upper or northerly line of the Traviesa Grant is not as shown on Plaintiff's Exhibit No. 1 then in the alternative under the evidence the upper or northerly line of the Traviesa Grant would be at the location as shown on Plaintiff's Exhibit 12-F and taking the calls for course and distance down from the lower or southerly line of the McDonough Grant under the evidence there would be a vacancy of 1855.3 acres from the southerly or lower line of the Vairin Grant—and this alternate upper line of the Traviesa Grant, which said tract is vacant, unappropriated lands of the State of Texas and subject to application.

The statements made concerning appellant's Group "A" Points (1–7) with respect to the basic "A" vacancy, the location of the McDonough lower line, the various grants down the Guadalupe river to and including the lower line of the Vairin, are also material under appellant's separate points relating to the alternate "A" vacancy. Appellant's position is that the lines from the McDonough south through the lower line of the Vairin as originally granted are correctly located by the evidence. However, with respect to the upper line of the Jose Maria Valdez, and consequently the upper line of the Traviesa, appellant says that at one time there appeared to be some uncertainty as to the location of these lines; but further says that these lines have now been definitely fixed and located by the evidence in the record at the place as marked on appellant's Exhibit 1 and Simpson's Map A, which would show the vacancy of 4353.5 acres. However, alternatively, appellant says in substance that if the evidence does not establish that location and is sufficient to raise a fact issue as to the other location of the upper line of the Traviesa as shown on Simpson Map B, then the vacancy of 1855.3 acres referred to in these points would result. Under this theory, the alternative "A" vacancy of 1855.3 acres (included in the basic "A" vacancy of 4353.5 acres) would result by reason of a reduction in the basic "A" vacancy acreage caused by placing the upper line of the Traviesa further up the Guadalupe river than was done under appellant's Group "A" Points (1–7). Appellant urges his Group D points (18–20) in part so that if the issue is raised on the new trial that this is the proper location of the upper line of Traviesa, then the Court can determine the question of the 1855.3 acre vacancy as well as the other alleged vacancies.

Appellant sets the location of the lines from the McDonough down to the lower line of the Vairin under both the 4353.5 acre basic "A" vacancy and the alternative "A" vacancy of 1855.3 acres at the same

place. However, under the 1855.3 acre vacancy theory, the upper line of the Traviesa would be further up the Guadalupe river so that instead of there being a distance of 3482.64 varas between the lower line of the Vairin and the upper line of the Traviesa (as in the "A" vacancy) there would be a distance of 1416.12 varas between the lower line of the Vairin and the upper line of the Traviesa. Under this alternative contention, the frontage call of 2750 varas on the Guadalupe river for the Vairin Grant would be enlarged by over 50% to 4166.12 varas and the backline calls and quantity would also be correspondingly enlarged.

There was evidence to raise fact issues concerning the alternate "A" vacancy, and the directed verdict and judgment against appellant on this phase of the case should not be sustained. In my view appellant's points eighteen and twenty should be sustained.

### Appellant's Points

#### Groups E–J

The preceding holdings, which I believe should be made would require that the case be reserved and remanded, on the basis that fact issues were presented concerning the alleged vacancies on the evidence actually admitted by the trial court, which precluded the directed verdict and judgment in favor of appellees.

Appellant's Groups of points E through J (21–133) assert that the trial court erred in excluding certain exhibits and testimony. In my view some of these points are well taken and a limited number of the matters involved will now be discussed.

#### Appellant's Group "E" Points (21–46)

Appellant's Group "E" contentions involve twenty-six points of error. Basically, these points relate to exclusion by the trial court of all proceedings in Fagan v. Stoner, 67 Tex. 286, 3 S.W. 44 (1887), and the testi-mony of surveyors Simpson and Baker based thereon.

Appellant makes it clear, and I agree, that the evidence, independently of Fagan v. Stoner, is legally sufficient to raise issues and support findings as to the location of the McDonough and the other grants down the Guadalupe river from it, as contended for by appellant. Appellant's contentions that the trial court erred in excluding Fagan v. Stoner and testimony related to it are based upon his sub-points A, B, C and D, as follows:

#### Sub-Point A

The Judgment of the Supreme Court of Texas in Fagan v. Stoner locating the lower line of the McDonough Grant is binding in this litigation.

#### Sub-Point B

The Record and Judgment in the case of Fagan v. Stoner and the Supreme Court's Decision and Judgment therein is competent evidence of the location of the lower line of the McDonough Grant and is admissible as such.

#### Sub-Point C

The Record and Judgment in the Trial Court and the Supreme Court of Texas in Fagan v. Stoner in the absence of any other testimony to actually locate the McDonough Grant on the ground in a contrary position is the best available evidence of the proper location of the lower line of the McDonough Grant and as such is admissible in evidence.

#### Sub-Point D

The Judgment of the District Court and of the Supreme Court, all in Fagan v. Stoner, is in the chain of title of the Defendants and for this reason admissible in evidence.

I agree with appellant in part, as hereafter indicated, as to sub-points B and C.

I disagree as to sub-points A and D, for the reasons now to be stated.

Appellant's basic position under his sub-point A is that under the doctrine of stare decisis the Supreme Court of Texas has settled the question in accord with his position by reason of its decisions in Federal Royalty Co. v. State, 128 Tex. 324, 98 S.W.2d 993 (1936); Short v. W. T. Carter & Brother, 133 Tex. 202, 126 S.W.2d 953 (1938); State v. Selby Oil & Gas Co., 135 Tex. 146, 139 S.W.2d 781 (1940); and by reason of its unqualified refusal of writs of error in Blaffer v. State, 31 S.W.2d 172 (Tex.Civ.App., Austin, 1930, wr. ref.); W. T. Carter & Bro. v. State, 139 S.W.2d 661 (Tex.Civ.App., Austin, 1940, wr. ref.); Patterson v. Peel, 149 S.W.2d 284 (Tex.Civ.App., Beaumont, 1941, wr. ref.); and by reason of its citing with approval the cases of Porter v. State, 15 S.W.2d 191 (Tex.Civ.App., Austin, 1929, n. w. h.); McDonald v. Humble Oil & Refining Co., 78 S.W.2d 1068 (Tex.Civ.App., Beaumont, 1935, wr. dism.). Appellant further says that there are other decisions of the Courts of Civil Appeals sustaining his position as to stare decisis, as follows: State v. Yates, 162 S.W.2d 747 (Tex.Civ.App., Austin, 1942, wr. dism. w. o. m.); State v. Franco-American Securities, 172 S.W.2d 731 (Tex. Civ.App., Galveston, 1943, wr. dism. w. o. m.); Joslin v. State, 146 S.W.2d 208 (Tex. Civ.App., Austin, 1940, wr. ref.); Wagers v. Swilley, 220 S.W.2d 673 (Tex.Civ.App., Galveston, 1949, wr. ref. n. r. e.); Parker v. Standard Oil Co. of Kansas, 250 S.W.2d 671 (Tex.Civ.App., Galveston, 1952, wr. ref. n. r. e.); State v. Ohio Oil Co., 173 S.W.2d 470 (Tex.Civ.App., Austin, 1943, wr. ref. w. o. m.); Rogge v. Gulf Oil Corporation, 351 S.W.2d 565 (Tex.Civ.App., Waco, 1961, wr. ref. n. r. e.); Douglas Oil Co. v. State, 70 S.W.2d 452 (Tex.Civ.App., Austin, 1933, n. w. h.). Appellant's position is that under the above authorities, the Supreme Court's decision and the record in Fagan v. Stoner, locating the lower line of the Mc-Donough and establishing the manner and method of locating the various grants down the Guadalupe river, i. e., the Gonzales, Rodriguez and Nira, by their call distances only, is binding and conclusive on the parties herein and should have been admitted in evidence.

In 21 Texas Law Review 241, there appears an article by Hon. Gus M. Hodges, Professor of Law, the University of Texas, titled "Stare Decisis in Boundary Disputes; Let There be Light", reviewing the cases on that subject relied on by the parties herein, up to its date (1942), and particularly discussing the subject of departure from orthodox stare decisis in boundary cases. Excerpts from said article are as follows:

"A definition of the doctrine of stare decisis as it is generally understood, sufficient for the purposes of this discussion, is as follows:

'A deliberate or solemn decision of a court or judge, made after argument on a question of law fairly arising in a case, and necessary to its determination, is an authority or binding precedent, in the same Court or in other Courts of equal or lower rank, in subsequent cases where "the very point" is again in controversy.'

"The purpose of this article is to examine the opinions of the courts to determine whether they have adopted by decision or by language such a departure from orthodox stare decisis in their consideration of boundary cases." (21 T.L.R. 242)

\* \* \* \* \* \*

"Although, as pointed out, the law is by no means settled on the question, some possible conclusions as to its present state may safely be drawn: (citing cases under each of the following subdivisions)

1. It cannot be demonstrated from an examination of the opinions alone that any actual decision has been made holding a prior decision binding as stare decisis, where the question of law deter-

mined therein was different from the question before the court.

2. In at least two cases, such a result may have been reached.

3. One court probably, and another possibly, are willing to so hold.

4. One court consistently, and another in one case, have definitely stated and decided that they would not disregard the orthodox limitation.

5. The court which could put the matter at rest has neither by holding nor by language adopted either view, and although apparently apprehensive of the consequences of disregarding the orthodox limitation, has clearly left open the question so as to be able to decide it either way." (21 T.L.R. 273–4).

\* \* \* \* \* \*

"Whatever rule may be adopted as to the nature of the doctrine of stare decisis as applied to boundary cases, some definite rule should be adopted at an early date, and adopted with a complete consideration and awareness of all factors involved. Let there be light,—not the seductive and misleading dimness of a cosy corner indirect lighting system, but the full glare of the spotlight." (21 T. L.R. 276)

The latest expression of our Supreme Court which I have found on the point under discussion is Swilley v. McCain, 374 S.W.2d 871 (1964), in which the Court held in part as follows:

"As originally conceived and as generally applied, the doctrine of stare decisis governs only the determination of questions of law and its observance does not depend upon identity of parties. After a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point

is again presented in a subsequent suit between different parties. As a general rule the determination of a disputed issue of fact is not conclusive, under the doctrine of stare decisis, when the same issue later arises in another case between persons who are strangers to the record in the first suit.

"Expressions by some of our Courts of Civil Appeals suggest that an adjudication of the location of a boundary line will control the location of the same line in a subsequent suit between different parties even though the first case turned upon an issue of fact or the questions of law involved in the later litigation are not the same. See Patterson v. Peel, Tex.Civ.App., 149 S.W.2d 284 (wr. ref.); Cockrell v. Work, Tex.Civ.App., 94 S.W. 2d 784 (wr. dis.); McDonald v. Humble Oil & Refining Co., Tex.Civ.App., 78 S.W.2d 1068 (wr. dis.); Porter v. State, Tex.Civ.App., 15 S.W.2d 191 (no writ). Another intermediate court has refused to disregard orthodox limitations on the doctrine of stare decisis even in boundary cases. See Dunn v. Land, Tex.Civ.App., 193 S.W. 698 (no writ); Horne v Moody, TexCiv.App., 146 S.W.2d 505 (wr. dis. judg. cor.). See also Hodges, Stare Decisis in Boundary Disputes: Let There Be Light, 21 Tex.Law Rev. 241. No light can be thrown on that problem here, but it is our opinion that a decision upholding a jury finding that a missing deed was executed and delivered as against the contention that such finding had no support in the evidence is not stare decisis in a subsequent suit between different parties of the fact so found by the jury in the first case.

"The principle of stare decisis does not make the Masterson case conclusive as to the superiority of the George Young title in the present suit. Plaintiffs say that they have not contended that it is, but they do insist that the holding of the Wagers case as to the effect of the Masterson decision is stare decisis. We do not agree. The conclusion reached

by the intermediate court on that question in the Wagers case was unsound, and we did not unqualifiedly approve all of the law declared in its opinion. See Rule 483, Texas Rules of Civil Procedure. A review of the application for writ of error discloses, moreover, that approval of the stare decisis holding was not necessarily involved in our denial of the writ of error. The holding of the intermediate court as to the effect of the Masterson decision is not, therefore, binding upon either defendants or this Court under the doctrine of stare decisis. See Conley v. Abrams, Tex.Civ.App., 7 S.W.2d 674 (wr. ref.); 14 Am.Jur., Courts § 74; 21 C.J.S. Courts § 198."

In Mitchell v. Town of Refugio, 265 S.W.2d 261 (Tex.Civ.App., San Antonio, 1954, writ refused, opinion by Norvell, J.) the court decided the case on the basis of stare decisis in connection with title to the bed of the Mission River in the town of Refugio. However, at page 268 of the opinion, the Court said:

"So far as we have been able to find, there are no parties to this suit who claim under the grant or survey lying immediately south of the Town Tract. This is therefore not a boundary dispute between claimants under adjoining and possibly conflicting grants. The south boundary line at the point it crosses the river is only incidently involved. It could hardly be contended that in a suit of this nature a boundary line could be established which would be binding upon the owners of lands in the adjoining grants by operation of the rule of stare decisis or otherwise. Gus M. Hodges, Stare Decisis in Boundary Disputes, 21 Texas Law Review 241. Appellants' group of points raising the contention discussed do not call for a reversal of the judgment."

It thus appears that the applicability of the doctrine of stare decisis in boundary disputes is therefore still an open question

to be ultimately settled by the Supreme Court.

In Fagan v. Stoner, the lower line of the McDonough was directly involved, as well as the upper line (and the upper line of the lower three-fourths) of the Gonzales. None of the alleged vacancy areas herein were there involved. In the instant case it appears that the McDonough Grant is not owned or claimed by appellees. The nearest point to it claimed by appellees is the upper line of the lower one-fourth of the Nira (as mentioned in the 1923 Hardy report). The last-mentioned Nira line is located 5500 varas from the lower line of the McDonough. The alleged vacancies are located lower down the Guadalupe River from the Nira and are separated from its lower line by the Ramon (2500 varas), Fernet (3000 varas) and the Vairin (2750 varas) as called for in the original grants.

While I am conscious of the uncertainties involved, I would hold that the judgment of the Supreme Court in Fagan v. Stoner, affirming that of the trial court, fixing the lines and location of the McDonough, is not binding as a matter of law on the parties to this suit under the doctrine of stare decisis. Appellees were not parties to Fagan v. Stoner, and the doctrine of res judicata is not involved. The locations of the alleged vacancy areas here were not in issue in Fagan v. Stoner. My opinion on the applicability of stare decisis in this case appears to be in accord with Horne v. Moody, 146 S.W.2d 505 (Tex. Civ.App., San Antonio, 1940, wr. dism. judgm. corr., opinion by Norvell, J.); Dunn v. Land, 193 S.W. 698 (Tex.Civ.App., San Antonio, 1917, n. w. h.); and Mitchell v. Town of Refugio, supra.

As to appellant's sub-point D, above set out, I would hold that Fagan v. Stoner is not directly in the chain of title of the appellees. The evidence herein reflects that the Stoner Pasture Co. was one of the defendants in Fagan v. Stoner and contended for the location of the lower Mc-

Donough line as found by the trial court and affirmed by the Supreme Court. Thereafter, following a number of transactions, all of the land formerly owned by Stoner Pasture Co. was acquired by T. D. Wood. In 1901, T. D. Wood conveyed to James A. McFaddin tracts of land out of the Nira, Ramon, Fernet and Vairin. Appellees concede in their brief that T. D. Wood owned the McDonough and Gonzales at the time of such conveyance to McFaddin. The land acquired by McFaddin in 1901 extended only to the upper line of the lower one-fourth of the Nira. It did not include the remaining three fourths of the Nira (although its upper line is described in the deed) nor the Rodriguez, Gonzales or McDonough. I agree with appellees here that the evidence does not bring Fagan v. Stoner within appellees' chain of title to the land or interests owned or claimed by them which are involved in this case. See Havis v. Thorne Inv. Co., 46 S.W.2d 329 (Tex.Civ.App., Amarillo, 1932, n. w. h.); Wichita Valley Ry. Co. v. Marshall, 37 S.W.2d 756 (Tex. Civ.App., Amarillo, 1931, n. w. h.); Davis v. Lund, 41 S.W.2d 57 (Tex.Comm'n App., 1931, holdings approved).

I now reach the contentions raised by appellant under his sub-points B and C, hereinabove set out, of his Group "E" points. Here it is appellant's alternative position that if Fagan v. Stoner is not binding and conclusive on the parties herein under the doctrine of stare decisis, it is nevertheless admissible in evidence to prove the location of the lower line of the McDonough and the widths of the three grants down the Guadalupe River from it; and in any event, independently of questions of admissibility of the judgment of the trial court and of the Supreme Court in Fagan v. Stoner, as a general proposition, under the circumstances of this case, the pleadings and judgment of the trial court and its findings of fact and the decision and judgment of the Supreme Court, all in Fagan v. Stoner, are admissible as the best available evidence. Appellant's argument

here is to a great extent repetitive of his argument concerning stare decisis. Many of the cases relied on by appellant to support that argument hold in effect that on the question of establishing ancient boundaries, the judgments in previous cases were admissible in evidence along with other evidence. See, e. g., Blaffer v. State, 31 S.W.2d 172 (Tex.Civ.App., Austin, 1930, writ refused); Porter v. State, 15 S.W.2d 191 (Tex.Civ.App., Austin, 1929, writ refused); Cockrell v. Work, 94 S.W.2d 784 (Tex.Civ.App., Galveston, 1936, writ dism.).

However, in connection with the best available evidence rule, appellant also cites Hart v. Greis, 155 S.W.2d 997 (Tex.Civ. App., Ft. Worth, 1941, wr. ref. w. o. m.) which relies upon the oft-cited case of Taylor v. Higgins Oil & Fuel Co., 2 S.W. 2d 288 (Tex.Civ.App., Beaumont, 1928, wr. dism.). In Hart v. Greis the court admitted into evidence the pleadings and judgment in a prior district court case along with a surveyor's report filed therein. The Court of Civil Appeals held that such evidence was properly admitted and relied upon the rule that it was the best available evidence. The Court held in part as follows:

"The lengthiest discussion we have been able to find of the rules of evidence applicable in cases like this one is found in Taylor v. Higgins Oil & Fuel Co., Tex.Civ.App., 2 S.W.2d 288, 300, writ of error dismissed, where it is said: 'Every rule of evidence laid down for guidance in boundary questions is for the purpose of ascertaining the true location of the line in dispute, by which is meant the place at which the original surveyor ran the line. After 90 years have elapsed and time has destroyed in large measure the evidence left by the original locater, it is then permissible, not only permissible, but of necessity is required, that we resort to any evidence tending to establish the place of the original footsteps which meets the requirement that it is the best evidence of which the case is susceptible.'

In a case like this, where the nearest corners even pretended to have been located from objects on the ground were from two to five miles and further away, almost any information tending to throw light on the location of the lines in dispute, even though vague or remote in character, has to be considered."

\* \* \* \* \* \*

"In 1904, there was tried in the District Court of Wichita County a certain suit styled Stokes v. Hamilton, involving a boundary dispute between owners in the Gahagan, Gibbs and Beckham Surveys. The surveyor C. B. Patterson filed in that case a report of a resurvey he had made of some of this area, indicating that his original survey of the Davis, and possibly some of his other surveys, were inaccurate. Defendant objected to the admission in evidence of the pleadings and judgment in the case, and Patterson's report therein. We think that no error was committed in this respect. Patterson was dead at the time of the trial of the suit now on appeal. Nothing being found on the ground at the west line of the Gahagan, it had to be located either from other calls of the Gahagan, or from any other evidence which, under the language of the Taylor v. Higgins Oil & Fuel Co. case, 'meets the requirement that it is the best evidence of which the case is susceptible.' Klotz had, previous to the introduction of this matter in evidence, referred to Patterson's relocation of his corners of the Davis. The report tended to show that Patterson's work was not always accurate. It was the kind of case where almost any and every kind of information available was needed. In 7 Tex.Jur., page 223, it is said: 'The field notes of a surveyor who was in position to know the boundaries of a survey are admissible as declarations, and as an exception to the hearsay rule if it is proved that they are in his handwriting and that he is dead at the time they are introduced in evidence.'

Defendant having challenged the authenticity of the report, the other proceedings in the case were admissible, not only to establish the authenticity of the report, but to explain the report by showing what problem confronted Patterson when he made his resurvey and his report to the court. See Blaffer v. State, Tex.Civ. App., 31 S.W.2d 172; Stroud v. Springfield, 28 Tex. 649; Pierce v. Schram, Tex.Civ.App., 53 S.W. 716."

The general rule with respect to the relaxation of technical rules of evidence in order to secure the best evidence available, to establish a boundary, is well stated in Linney v. Wood, 66 Tex. 22, 17 S.W. 244 (Tex.Sup.1886) wherein Chief Justice Willie, speaking for the Court said:

"In reference to such matters as boundaries of land surveyed long ago, the signs of which have been destroyed, and the location of which is not within the memory or knowledge of living men, many facts, tending to solve the question as to their true location, are permitted to go to the jury which the rules of evidence would exclude in other cases. Hence the declarations of deceased persons are received. The evidence afforded by these grants is of a somewhat similar nature, and furnished a circumstance, though it may have been very slight, as to the received opinion in reference to the upper line of the Aldrete grant soon after it was issued. There was, of course, no error in admitting the declarations of Power, Aldrete and Welder, as they were deceased persons, who, at the time of making the declarations, were in a situation to possess information as to the facts concerning which their statements were made. Stroud v. Springfield, 28 Tex. 649. \* \* \*"

In connection with the best available evidence rule, appellant also relies on one of the leading cases on the subject, i. e., Dallas County v. Commercial Union Assurance Company, 286 F.2d 388 (1961), by the Court of Appeals for the Fifth Circuit. In

that case, one of the parties sought to introduce a copy of the Morning Times of Selma, Alabama for June 9, 1901 to show that there had been a fire in the Courthouse. The trial court admitted this. On appeal the only question presented concerned the admissibility of the newspaper. The opinion contains one of the best discussions of admissibility to be found. The Court, in summary, does not characterize the newspaper as a business record, as an ancient document or any other readily identifiable and fully labeled species of hearsay exception, but held that the document was admissible as the best evidence available and appeared to be trustworthy, relevant and material.

An examination of the record in Fagan v. Stoner reflects that it judicially located the lines of the McDonough Grant. Furthermore, additional details are shown by the record offered in evidence which do not appear in the Supreme Court opinion or judgment affirming that of the trial court; particularly in the pleadings, judgment and findings and conclusions of the trial court. These additional matters when considered along with the judgment and opinion of the Supreme Court show in part that the case was strongly contested and fully developed. The plaintiffs (Fagan) were held and adjudged to own to the lower line of the McDonough (2000 varas from its northwest boundary line, which was well established), and additionally to the lower line of the upper quarter of the Gonzales. The defendants, who included The Stoner Pasture Company, a corporation, George O. Stoner and Peter F. Stoner, were held and adjudged to own (along with other defendants) the lower three quarters of the Gonzales.

In Fagan v. Stoner, the court was directly concerned with the location and construction of the original McDonough Grant. Its width was held to 2000 varas as called for in the grant and its southeast corner (which is also the northeast corner of the Gonzales) was located some 225 varas on the Guadalupe River below its junction

with the Coletto Creek. This is substantially the location contended for by appellant in this case.

I would hold that the pleadings and judgment of the trial court, its findings of facts and conclusions, and the opinion and judgment of the Supreme Court of Texas in Fagan v. Stoner were admissible in evidence herein under the best available evidence rule; and that the testimony of surveyors Simpson and Baker based thereon was also admissible.

*Appellant's Group "G" Points
(87–88)*

Appellant's points 87 and 88 read as follows:

"Point Eighty-Seven

The Court erred in excluding the Testimony of the witness McCan reading as follows:

'QUESTION: Do you have any position or claim with respect to where the north and south lines of the Fernet Survey are located?

ANSWER: Our position is the Hardy map.

QUESTION: Your position is the Hardy map across the board on all the lines?

ANSWER: Yes, sir, so far as I know about it. It—it came down to me as a survey on the ground and that was it.'

Point Eighty-Eight

The Court erred in excluding the Testimony of the witness McCan to the effect that over a period of years Mr. Crain a co-manager of the McFaddin Estate and one of its co-owners and the witness McCan, had discussed at great length the question of vacancies, that they had discussions on the various phases of the question, but that they had never dis-

cussed the question of vacancy or excess in the Vairin in any detail."

I would sustain these points. The excluded testimony mentioned in the above points was contained in the deposition of Mr. C. K. McCan, part owner of the McFaddin Estate and its general manager. The evidence reflects that the witness-defendant became a co-manager of the McFaddin Estate in 1924 and had continued in such capacity until the date of trial. The excluded testimony elicited from Mr. McCan, is reflected in a proper bill of exception. The testimony showed the position or claim of the principal defendant herein as to the location of the lines of the Fernet as set out on the 1923 Hardy map. As previously mentioned, the Hardy map places the lines of the Fernet and the lines of the other grants down the Guadalupe River to the lower line of the Traviesa (or the upper line of the Jose Maria Valdez) in substantially the same locations as contended for by appellant (except for the lower line of the Vairin, which, as previously discussed, would result from greatly enlarging its calls for distance and quantity beyond the original grant in order to reach the Traviesa upper line). The excluded testimony also tended to show, along with other evidence in the case, the recognition by Mr. Crain, one of the co-managers of the McFaddin Estate and ranch, and by Mr. McCan of the original lines located by Hardy and the questions of excess or vacancy. The testimony mentioned in appellant's points 87 and 88 was admissible. See Brohlin v. McMinn, 161 Tex. 319, 341 S.W.2d 420 (1960); Smith v. Russell, 37 Tex. 247 (1872).

### Appellant's Group "H" Points (89–102)

Appellant's Group "H" contentions involve forty exhibits which were excluded by the trial court. The Plaintiff's Exhibits involved in these points are numbers 174, 182–197, 199, 200–211, 212–219, 221, 222. The points which do not specifically relate to exclusion of the exhibits, complain of exclusion of surveyor Baker's testimony based upon them. Thirty-eight of the exhibits are instruments which appellant claims to be in appellees' chain of title and two of the exhibits (Pltf. 221 & 222) are plats prepared by surveyor Baker. Exhibit 221 is a plat showing the location of various tracts covered by the excluded instruments involving transactions primarily between the lower line of the Fernet (and upper Vairin) and the upper line of the Traviesa (as located on appellant's Ex. 1 and on the 1923 Hardy plat). Exhibit 222 is basically the 1923 Hardy map on which Baker platted and marked the land covered by the 1901 deed from Wood to McFaddin (P.Ex. 199) consisting of 8584 acres. There is some doubt in the record as to whether plaintiff's Exhibit 222 was admitted or excluded, and appellant's complaint is on the basis that it was excluded.

All of the exhibits mentioned were ancient instruments, except Exhibits 221 & 222 prepared by Baker. Appellant's brief summarizes these instruments and transactions in several pages of his brief so as to show in substance that beginning in 1835, when Vairin conveyed his grant to Fernet, down to the time when James A. McFaddin acquired record title to various tracts from about 1881 to 1901, there had been a number of transactions which reflected that there was a large amount of acreage between the Fernet lower line and the Traviesa upper line which could not be included in the original Vairin Grant according to its calls for distance and quantity.

I do not believe that it is necessary to discuss each exhibit, page or sentence separately in connection with the points now under consideration. However, it appears generally from the excluded instruments that beginning in about 1850 and for a number of years thereafter, the parties dealing with the area between the lower line of the Fernet and the upper line of the Traviesa, including S. A. White, one of the original surveyors for the Colony, recognized the existence of a tremendous excess between those lines. When the Guadalupe River frontages called for by these transactions are added, they account

for a distance of about 5910 varas from the lower Fernet line to the Traviesa upper line. This distance compares with 6332.6 varas found by Surveyor Simpson and 6161 varas found by Surveyor Hardy in 1923 to exist as river frontage between the two lines (lower Fernet and upper Traviesa).

On the present record it appears to me that the trial court erred in excluding the exhibits which appear, at least prima facie, to be in appellees' chain of title. These exhibits tend to prove among other things, long recognition by appellees' predecessors in chain of title of the locations of the original Fernet lower line (which is also the Vairin upper-line) and the Traviesa upper line as shown on appellant's Exhibit 1.

The rule is well settled that where boundary issues are presented, recitations in ancient documents, and particularly those in the chain of title of one of the parties, are admissible to prove such boundaries. See Greene v. White, 137 Tex. 561, 153 S.W.2d 575, 136 A.L.R. 626 (1941); Brateman v. Upper Channel Site Company, 378 S.W.2d 882 (Tex.Civ.App., Houston, 1964, wr. ref. n. r. e.); Davis v. Mills, 63 Tex.Civ.App. 359, 133 S.W. 1064 (Tex.Civ.App., Dallas, 1911, wr. dism.); Pierce v. Schram, 53 S.W. 716 (Tex.Civ.App., Galveston, 1899, n. w. h.); Texas Practice, McCormick & Ray, 2d Ed., Vol. 2 Secs. 1361–1364. I believe that the excluded exhibits and Baker's testimony and exhibits in connection therewith were generally admissible. However, it is not my desire to attempt to rule in advance concerning the issues which may be presented to the trial court if the exhibits and testimony involved in appellant's Group "H" points are again offered on the new trial. In that event, the admission or exclusion of the exhibits and testimony should be determined under the applicable rules, subject to the objections made, in the usual manner.

*Appellants Group "J" points (118–133)*

The 16 points in this group relate to the alleged error of the trial court in refusing to admit the deposition testimony of the witness Simpson to the effect that he refused to testify in person on the trial of the case because he had concluded there was a conflict of interest with the defendant-appellee Humble Oil & Refining Company for which Company Simpson did work. The position of appellees in the trial court and here is that the proffered deposition testimony of Simpson constituted impeachment by appellant of his own witness, and was properly excluded.

Appellant's contentions on this phase of the case are in substance that such testimony was not impeachment within the meaning of the rule; that it was admissible to show the interest or bias of Simpson so that the jury could evaluate his testimony; that appellant was and is entitled to show the reason for non-production of Simpson in person as a witness; that since Simpson was the only witness known to appellant with knowledge of the facts, appellant was bound to call him if available to testify, and under the circumstances, appellant was not prevented from showing Simpson's prejudice or bias; and that, if a witness is obviously hostile, he may be treated as if the other side had called him as a witness. Appellant argues that where non-production of a witness would have an adverse effect before the jury, a party is entitled to show the reason for his non-production. In this case, the directed verdict prevented submission of the case to the jury, and the contentions now under consideration relate primarily to the new trial. Appellant says, particularly, that if upon re-trial fact issues are presented as to matters involved in Simpson's testimony, appellant should be in position to show to the jury Simpson's association with and alleged subservience to at least some of the defendants, which it could consider in evaluating his testimony.

Some of the facts developed by Simpson's deposition testimony are in substance as follows: He was appointed by the Land Commissioner as surveyor on appellant's mineral applications, and was paid ap-

proximately $19,000.00 for his work, the money being furnished by appellant as provided by the Statute. He testified in person at the hearing before the Land Commissioner but concluded thereafter that there was or would be a conflict of interest with Humble. Simpson said that if he testified, his position with Humble would be jeopardized. Simpson had been paid by Humble approximately $25,000.00 per year for about 10 years before his appointment, or a total of around $250,000.00 in that period of time. Simpson said that the conflict of interest was due to such payment. Simpson had been appointed 20 to 25 times by the Land Commissioner to make surveys, had testified some 10 to 15 times in other cases, and prior to the instant case had never declined to testify in court. Simpson further said that testifying in person would not help his business with Humble and "working for Humble as I have stated, I feel like I am obligated enough to them, for what they have given me in the past, not to testify."

I am of the opinion that the above-mentioned deposition testimony of Simpson and more of it of a similar nature was admissible under the circumstances. I do not believe that such testimony constitutes impeachment within the meaning of the rule prohibiting it. It appears to be admissible, if appellant elects to offer it, to account for non-production of Simpson in person and to show his position in the case. See Texas Practice, Evidence, McCormick and Ray, Vol. 1, Sec. 631, p. 479, Sec. 634, p. 481; Sparks v. Johnson, 235 S.W. 975 (Tex. Civ.App., Beaumont, 1921, n. w. h.); Pitman v. Holmes, 34 Tex.Civ.App. 485, 78 S.W. 961 (Tex.Civ.App., San Antonio, 1904, n. w. h.).

### Appellant's Remaining Points

In the second paragraph of this opinion I pointed out that the judgment below should be reversed because of the existence of fact issues concerning the alleged vacancies and errors in excluding evidence of-

fered by appellant. It is also my view that on a new trial, appellant's contentions concerning admissibility of exhibits and testimony excluded on the first trial, if reoffered, might be further considered in the then posture of the case, particularly in the light of proper exceptions to the hearsay rule and the best available evidence rule as recognized in ancient boundary cases.

### Conclusion

As hereinbefore stated, my consideration of whether material fact issues were raised on the trial below has been governed by the principles of law applicable to an appeal from a judgment based upon a directed verdict. Appellees correctly contend that the burden of proof is on appellant to establish the existence of the alleged vacancies and to locate them. The ultimate fact issues concerning these matters remain to be resolved on a new trial of the case.

In my view, the judgment of the trial court should be reversed and the cause remanded for new trial. For the reasons stated, I respectfully dissent to affirmance of the judgment below.